UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



_____

JAMES W. D'AMICO, on behalf of himself and
all others similarly situated,

        Plaintiff,

  v.

WASTE MANAGEMENT OF
NEW YORK, LLC,

        Defendant.

_____

**DECISION AND ORDER**

6:18-CV-06080 EAW

## **INTRODUCTION**

Plaintiff James W. D'Amico ("Plaintiff") brings this putative class action, on behalf of himself and all others similarly situated, against Defendant Waste Management of New York, LLC ("Defendant"), alleging common law claims for nuisance, negligence, and gross negligence, arising from Defendant's operation of the High Acres Landfill and Recycling Center (the "Landfill") in Fairport, New York. (Dkt. 4). Specifically, Plaintiff alleges that Defendant's operation of the Landfill has caused noxious odors to be emitted into the surrounding environment, resulting in property damage to himself and the owner/occupants and renters in the surrounding area. (*Id.* at 2-5).

Presently before the Court is Defendant's motion to dismiss. (Dkt. 13). For the following reasons, Defendant's motion is granted in part and denied in part.

# BACKGROUND[1]

Defendant operates the Landfill on a 1,100-acre site and "accepts municipal solid waste, industrial and special waste, construction and demolition debris, and other waste for disposal." (Dkt. 4 at ¶¶ 4, 6). As the waste decomposes at the Landfill, it creates "odorous landfill gas, leachate, and other byproducts." (*Id.* at ¶ 7). Defendant is obligated to control odorous emissions by, among other things, "following proper landfilling practices, utilizing adequate landfill cover, and installing, operating, and maintaining a sufficient landfill gas collection system to capture and destroy landfill gas." (*Id.* at ¶ 10). In order to effectively maintain the landfill gas collection system (the "Collection System"), Defendant must prevent "excess liquid" from entering the system and interfering with its operation. (*Id.* at ¶ 11).

Defendant has allegedly failed to satisfactorily control the odors emitted from the Landfill. (*Id.* at ¶ 12). Specifically, Plaintiff claims that Defendant has failed to properly operate the Collection System and has allowed it to become "watered in." (*Id.*). This alleged operating failure is due to inadequate drainage systems, Defendant's reliance upon vertical gas wells, insufficient preparation for wet weather conditions, an "inadequate wellhead vacuum," the failure to properly monitor the system and use a proper "cover and covering practices," and the "inadequate use of odor neutralizing systems and products." (*Id.*).

---

[1] The following facts are taken from Plaintiff's Amended Complaint unless otherwise indicated. (Dkt. 4).

As a result, Defendant has allegedly released "odorous emissions . . . onto the property of Plaintiff and the class on occasions too numerous to recount individually." (*Id.* at ¶ 13). The odors are "offensive" and have interfered with Plaintiff's and the putative class members' use and enjoyment of their property. (*Id.* at ¶ 14). Plaintiff claims that "Defendant's emissions are especially injurious to the Class as compared with the public at large, given the impacts to their homes." (*Id.* at ¶ 15). In particular, these emissions have caused a diminution in the value of Plaintiff's and the putative class members' property. (*Id.* at ¶ 16).

Numerous individuals have filed complaints with the New York State Department of Environmental Conservation ("NYSDEC") detailing the noxious odors in the community. (*Id.* at ¶ 17). "[M]ore than 180 households have contacted Plaintiffs' counsel documenting the odors they attribute to" the Landfill. (*Id.* at ¶ 18).

Plaintiff seeks to certify the following putative class: "All (a) owner/occupants and (b) renters of residential property residing within two and one-half (2.5) miles of the Defendant's Landfill." (*Id.* at ¶ 20). Plaintiff also claims that "there are over three thousand (3,000) households within the 2.5-mile radius that are being impacted." (*Id.* at ¶ 21).

## PROCEDURAL HISTORY

On January 26, 2018, Plaintiff commenced this putative class action, on behalf of himself and all others similarly situated, seeking compensatory and punitive damages as well as injunctive relief under theories of common law nuisance, negligence, and gross negligence. (Dkt. 1). On April 27, 2018, Plaintiff filed an Amended Complaint, which

- 3 -

removed Waste Management, Inc. as a defendant. (Dkt. 4). The Amended Complaint remains the operative pleading in this matter. On July 23, 2018, Defendant filed a motion to dismiss. (Dkt. 13). Plaintiff opposed Defendant's motion to dismiss (Dkt. 14), and Defendant submitted reply papers in further support of its motion (Dkt. 16). The Court held oral argument on Defendant's motion on December 7, 2018, and reserved decision. (Dkt. 27).

## DISCUSSION

### I.     Legal Standard

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2279 (2017). To withstand dismissal, a plaintiff must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

## II. Plaintiff's Cause of Action for Nuisance Fails to State a Claim

### A. General Principles

"There are two types of nuisance actions in New York State, public nuisance and private nuisance." *Hicksville Water Dist. v. Philips Elecs. N. Am. Corp.*, No. 2:17-CV-04442 (ADS)(ARL), 2018 WL 1542670, at *7 (E.D.N.Y. Mar. 29, 2018). "Public and private nuisance bear little relationship to each other. Although some rules apply to both, other rules apply to one but not the other." *State of N.Y. v. Shore Realty Corp.*, 759 F.2d 1032, 1050 (2d Cir. 1985). "A public nuisance under New York law exists when there is a substantial interference with a public right." *Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 390 (E.D.N.Y. 2004). By contrast, "[a] private nuisance threatens one person or a relatively few, an essential feature being an interference with the use or enjoyment of land." *Copart Indus., Inc. v. Consol. Edison Co. of N.Y.*, 41 N.Y.2d 564, 568 (1977); *see Scribner v. Summers*, 84 F.3d 554, 559 (2d Cir. 1996) (same). "A nuisance is the actual invasion of interests in land, and it may arise from varying types of conduct." *532 Madison Ave.*

- 5 -

*Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 292 (2001). Generally speaking, a landowner "is subject to liability for either a public or private nuisance on its property upon learning of the nuisance and having a reasonable opportunity to abate it." *Shore Realty Corp.*, 759 F.2d at 1050 (footnote omitted).

Although Plaintiff's Amended Complaint does not specifically identify whether he asserts a claim under theories of private nuisance, public nuisance, or both, at oral argument Plaintiff's counsel agreed that he has alleged only a public nuisance cause of action. Accordingly, the Court will review the sufficiency of Plaintiff's allegations under a public nuisance theory of liability.

### B. Public Nuisance

"A public nuisance exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place or endangering or injuring the property, health, safety or comfort of a considerable number of persons." *532 Madison Ave.*, 96 N.Y.2d at 292. "It is uncontested that the historical purpose of the doctrine of public nuisance was primarily to protect the public from harm or danger; the same is equally true of the modern tort of public nuisance." *N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 481 (E.D.N.Y. 2003). For this reason, a public nuisance is considered "an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency." *Copart Indus., Inc.*, 41 N.Y.2d at 568. "The State has standing to bring actions for public nuisance as a matter of course in its role as 'guardian of the environment.'" *Chase*

*Manhattan Bank, N.A. v. T & N plc*, 905 F. Supp. 107, 125 (S.D.N.Y. 1995) (quoting *Shore Realty Corp.*, 759 F.2d at 1051).

"Generally, '[a] public nuisance is actionable by a private person only if it is shown that the person suffered special injury beyond that suffered by the community at large.'" *Janki Bai Sahu v. Union Carbide Corp.*, 528 F. App'x 96, 102 n.4 (2d Cir. 2013) (quoting *532 Madison Ave.*, 96 N.Y.2d at 292); *see Johnson*, 304 F. Supp. 2d at 392 ("A private plaintiff does not have standing to bring a public nuisance cause of action unless he or she shows some harm different from that suffered by the public generally."). "In this way, a private wrong may be distinguished from a common injury to the public, and a private right of action is restored." *Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d 233, 248 (N.D.N.Y. 2017) (citing *Kavanagh v. Barber*, 131 N.Y. 211, 214 (1892) ("The public nuisance as to the person who is specially injured thereby in the enjoyment or value of his lands becomes a private nuisance also.")); *see also* 81 N.Y. Jur. 2d *Nuisances* § 6 (2018) ("[A] public nuisance becomes also a private nuisance as to any person who is specially injured by it to any extent beyond the injury to the public." (citing *Ackerman v. True*, 175 N.Y. 353, 360-61 (1903))). "This principle recognizes the necessity of guarding against the multiplicity of lawsuits that would follow if everyone were permitted to seek redress for a wrong common to the public." *532 Madison Ave.*, 96 N.Y.2d at 292.

A review of the allegations contained in the Amended Complaint reveals that it does not once specifically allege that Defendant's operation of the Landfill has interfered with a right held in common by the public. *See Haire v. Bonelli*, 57 A.D.3d 1354, 1358 (3d Dep't 2008) (affirming dismissal of the plaintiff's public nuisance cause of action where

the plaintiff "did not allege an interference with rights belonging to the general public, nor an interest in public land"); *Reid v. Kawasaki Motors Corp., U.S.A.*, 189 A.D.2d 954, 957 (3d Dep't 1993) ("The *sine qua non* of an action for public nuisance . . . is the interference by a defendant with a public right. The complaint here simply is bereft of any such allegations." (citation omitted)). At oral argument, Plaintiff's counsel argued that this Court should infer that the Landfill is causing harm to the public's right to clean air. Plaintiff's Amended Complaint alleges, among other things, that Defendant owes a duty "to prevent and abate the interference with the invasion of *the private interests* of the Plaintiffs," and that "Defendant has intentionally and negligently caused an unreasonable invasion of *Plaintiffs' interest* in the use and enjoyment of *their property*." (Dkt. 4 at ¶¶ 32-33 (emphases added)). Notably, the Amended Complaint fails to set forth a single allegation specifically stating that Defendant's operation of the Landfill has substantially interfered with a public right; rather, the relevant allegations pertain to Defendant's purported interference with private property rights.

A liberal construction of the Amended Complaint might *conceivably* permit an inference that the Landfill's noxious emissions have substantially interfered with the public's right to uncontaminated and unpolluted air. *See generally Town of Mount Pleasant v. Van Tassell*, 7 Misc. 2d 643, 646 (N.Y. Sup. Ct., Westchester Cty. 1957) ("[I]t is well established that noxious smells or odors alone may constitute a nuisance although they are not unwholesome or injurious to the health but merely offensive and unpleasant."), *aff'd*, 6 A.D.2d 880 (1958); Restatement (Second) of Torts § 821B cmt. g. (1979) ("In any case in which a private nuisance affects a large number of persons in their use and

enjoyment of land it will normally be accompanied by some interference with the rights of the public as well. Thus the spread of smoke, dust or fumes over a considerable area filled with private residences may interfere also with the use of the public streets or affect the health of so many persons as to involve the interests of the public at large."). However, the mere possibility that there has been a "substantial interference" with the public's right to clean air does not satisfy federal pleading standards; if a plaintiff has "not nudged [his] claims across the line from *conceivable to plausible*, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570 (emphasis added). Because Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face," *id.*, Plaintiff's allegations that the noxious odors have interfered with the use and enjoyment of private property rights fail to sufficiently allege a substantial interference with a right enjoyed by the public generally. Accordingly, Plaintiff's public nuisance claim is dismissed without prejudice. As a result, the Court does not reach Defendant's other arguments challenging the sufficiency of Plaintiff's public nuisance claim.

### III. Plaintiff's Amended Complaint States a Claim for Ordinary Negligence, But Fails to State a Claim for Gross Negligence

Under New York law, "a plaintiff must establish three elements to prevail on a negligence claim: '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'" *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (quoting *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981)). To prevail on a claim for gross negligence, a plaintiff must establish the three elements required of ordinary negligence and further demonstrate that

the defendant engaged in "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *Am. Tel. & Tel. Co. v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996) (quoting *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 81 N.Y.2d 821, 823-24 (1993)). As discussed below, Plaintiff has adequately alleged a negligence cause of action, but not a gross negligence claim.

## A.    Ordinary Negligence

At the heart of the parties' dispute regarding the negligence cause of action is whether Plaintiff has sufficiently alleged legally cognizable damages to state a claim for ordinary negligence. Defendant argues that Plaintiff's alleged diminution in property values is a "purely economic harm[]" that is not recoverable under a theory of negligence. (Dkt. 13-1 at 16-18).

The "Second Circuit has determined that New York does not recognize a tort cause of action when only economic loss is sought." *Greater N.Y. Auto. Dealers Ass'n v. Envtl. Sys. Testing, Inc.*, 211 F.R.D. 71, 82 (E.D.N.Y. 2002); *see Suffolk County v. Long Island Lighting Co.*, 728 F.2d 52, 62 (2d Cir. 1984) ("New York law holds that a negligence action seeking recovery for economic loss will not lie."). "In other words, 'it is well-established under New York law that, where a plaintiff alleges only economic damages resulting from defendant's alleged negligence, defendants owe no duty to plaintiffs with whom they are not in contractual privity.'" *Four Directions Air, Inc. v. United States*, No. 5:06-CV-283 (NAM/GHL), 2007 WL 2903942, at *3 (N.D.N.Y. Sept. 30, 2007) (quoting *Land Mine Enters. v. Sylvester Builders, Inc.*, 74 F. Supp. 2d 401, 407 (S.D.N.Y. 1999), *aff'd*, 234 F.3d 1262 (2d Cir. 2000); *see also Niagara Mohawk Power Corp. v. Stone & Webster*

- 10 -

*Eng'g Corp.*, 725 F. Supp. 656, 665 n.6 (N.D.N.Y. 1989) ("The term 'economic loss' or 'economic damage' in this context refers to damages which are sought by a plaintiff other than for 'physical damage to person or property resulting from an accidental cause.'" (quoting *Antel Oldsmobile-Cadillac, Inc. v. Sirus Leasing Co., Div. of Sirus Enters.*, 101 A.D.2d 688, 688 (4th Dep't 1984))).

Nevertheless, the case law reveals that "'stigma damages' have been recognized as a valid category of damages by the New York courts in environmental cases." *87th St. Owners Corp. v. Carnegie Hill-87th St. Corp.*, 251 F. Supp. 2d 1215, 1223 (S.D.N.Y. 2002) (quoting *Commerce Holding Corp. v. Bd. of Assessors of the Town of Babylon*, 88 N.Y.2d 724, 732 (1996)). Stigma damages have been "defined loosely as the public's perhaps unwarranted fears concerning a property" that result in the diminution in that property's value. *Nashua Corp. v. Norton Co.*, No. 90-CV-1351 (RSP/RWS), 1997 WL 204904, at *6 (N.D.N.Y. Apr. 15, 1997). These damages are recoverable because the diminished property values result from an actual or imminent invasion of a landowner's property by a defendant's polluting conduct.[2] *See Donavan v. Saint-Gobain Performance Plastics Corp.*,

---

[2] While the pollution alleged here entails the emission of gaseous particulate matter in the form of "odors" permeating Plaintiff's property, there is no meaningful distinction between the public's perception of more tangible impacts to land or water resources and the contamination of air space. *See generally Donavan v. Saint-Gobain Performance Plastics Corp.*, No. 1:16-CV-924 (LEK/DJS), 2017 WL 3887904, at *5 (N.D.N.Y. Sept. 5, 2017) (noting that allegations that the plaintiff's property "has been contaminated through air emissions . . . would likely state a plausible claim for property damages"); *Criscuola v. Power Auth. of State of N.Y.*, 81 N.Y.2d 649, 651 (1993) (holding that the diminution in market value of property resulting from "'cancerphobia' and the public's perception of a health risk from exposure to electromagnetic emissions from power lines" that run across the property should be considered in evaluating "just compensation" in the

No. 1:16-CV-924 (LEK/DJS), 2017 WL 3887904, at *4 (N.D.N.Y. Sept. 5, 2017) ("Courts applying New York law have concluded that loss-of-value damages constitute a sufficient injury in contamination suits when the plaintiff's property is *directly affected* by the defendant's conduct." (emphasis added)); *see Baker*, 232 F. Supp. 3d at 246 (same); *Halliday v. Norton Co.*, 265 A.D.2d 614, 617 (3d Dep't 1999) (holding that where there was inadequate proof of "contamination in plaintiffs' soil or water wells, or in the surrounding neighborhood[, a]ny alleged consequential damages emanating, in part, from the adverse publicity associated with the landfill were . . . not proven to have arisen from the migration of toxins or from defendants' actions" (citation omitted)); *Nalley v. Gen. Elec. Co.*, 165 Misc. 2d 803, 810 (N.Y. Sup. Ct., Rensselaer County 1995) (denying recovery for "negative market stigma" where there was "no evidence that the land or water of the plaintiffs . . . is contaminated by toxic substances" nor "a competent evidentiary showing of an imminent threat of contamination to any of these properties, or even a showing of a high likelihood of future contamination"); *see also Adams v. Star Enter.*, 851 F. Supp. 770, 773 (E.D. Va. 1994) (dismissing the plaintiffs' claim because their alleged "risk to health and property" from an underground oil plume was "no more than mere mental distress" where they did "not complain of actual oil odors, ground water contamination, or other material interference with their properties"), *aff'd*, 51 F.3d 417 (4th

---

"takings" context); *Butler v. Frontier Tel. Co.*, 186 N.Y. 486, 491 (1906) ("The surface of the ground is a guide, but not the full measure [of real property], for within reasonable limitations land includes not only the surface but also the space above and the part beneath.").

Cir. 1995); *cf. Hanna v. Motiva Enters., LLC*, 839 F. Supp. 2d 654, 680 (S.D.N.Y. 2012) (granting summary judgment against the plaintiffs' "general claim that the stigma associated with the contamination of their property renders it unmarketable" because the plaintiffs "point to no other evidence linking the contamination of their property with any diminution property value"); *see generally Criscuola*, 81 N.Y.2d at 651.[3]

In other words, stigma damages, while economic in nature, are distinguishable from "purely economic harm" that arises from the loss of intangible financial interests unaccompanied by any tangible intrusion onto the property. *See Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 16 (2d Cir. 2000) (stating that New York courts, to prevent "open-ended liability, . . . have applied the economic loss rule to prevent the recovery of damages that are inappropriate because they actually lie in the nature of breach

---

[3]   The Second Circuit appears to have last discussed this issue in 2000, when it "question[ed] whether *Criscuola* and cases similar to it" were relevant to the issue of "whether diminution in the value of property, *without more*, can constitute an interference with use and enjoyment." *Mehlenbacher v. Akzo Nobel Salt, Inc.*, 216 F.3d 291, 299 (2d Cir. 2000). After suggesting that *Criscuola* may be limited to the context of just compensation in takings disputes, the Second Circuit stated:

> Citing *Criscuola* for the proposition that stigma damages are available in a tort action, therefore, begs the question, which is rather whether, absent some other interference with plaintiffs' ability to use and enjoy their property, liability in nuisance exists. And this question seems not to be answered by the New York cases.

*Id.* at 300. *Mehlenbacher* is distinguishable from the present case because Plaintiff and the putative class have alleged an interference with their use and enjoyment of property as a result of the noxious odors and rely upon the diminution of property value as an additional injury. *Cf. id.* at 293 (noting that some of the plaintiffs seek to recover for the diminution of property values resulting simply from their residence being close in proximity to the salt mine). Furthermore, *Mehlenbacher* relates to a nuisance claim and does not address whether New York recognizes "stigma damages" in the context of a negligence claim.

of contract as opposed to tort" (citing *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 271 A.D.2d 49, 52 (1st Dep't 2000), *rev'd on other grounds*, 96 N.Y.2d 280 (2001))); *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 328 F. Supp. 3d 141, 159 (S.D.N.Y. 2018) (stating that the economic loss rule "reflects the premise that 'damages arising from the failure of the bargained-for consideration to meet the expectations of the parties are recoverable in contract, not tort, unless a legal duty independent of the contract itself has been violated'" (quoting *Suffolk Laundry Servs., Inc. v. Redux Corp.*, 238 A.D.2d 577, 578 (2d Dep't 1997))); *Carmania Corp., N.V. v. Hambrecht Terrell Int'l*, 705 F. Supp. 936, 938 (S.D.N.Y. 1989) (stating that "New York law . . . restrict[s] plaintiffs who have suffered 'economic loss,' but not personal or property injury, to an action for the benefits of their bargains," and that "[i]f the damages suffered are of the type remediable in contract, a plaintiff may not recover in tort" (footnote omitted)); *Bristol-Myers Squibb, Indus. Div. v. Delta Star, Inc.*, 206 A.D.2d 177, 181 (4th Dep't 1994) ("The economic loss rule reflects the principle that damages arising from the failure of the bargained-for consideration to meet the expectations of the parties are recoverable in contract, not tort."); *see also Hunt Constr. Grp., Inc. v. Brennan Beer Gorman/Architects, P.C.*, 607 F.3d 10, 14 (2d Cir. 2010) (explaining that Vermont's economic loss rule "is intended to maintain the distinction between tort law and contract law"). New York law recognizes that "[d]amages from the diminished market value of real property as a result of public fear of exposure to a potential health hazard constitute consequential damages." *Cottonaro v. Southtowns Indus., Inc.*, 213 A.D.2d 993, 993 (4th Dep't 1995).

In support of its motion, Defendant relies upon *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280 (2001), arguing that "defendant landowners do not owe a duty to their neighbors to avoid purely economic losses." (*Id.* at 16); *see 532 Madison*, 96 N.Y.2d at 290 ("We have never held . . . that a landowner owes a duty to protect an entire urban neighborhood against purely economic losses."). *532 Madison* involved consolidated appeals regarding "construction-related disasters in midtown Manhattan," where various businesses sought redress for their lost business and income. 96 N.Y.2d at 286, 293-94. Defendant contends that the diminished property values alleged in this case are akin to the financial losses incurred by the businesses in *532 Madison*. (Dkt. 13-1 at 16-17). Furthermore, Defendant argues that any diminution in property value is not recoverable in this case because Plaintiff has failed to allege any physical damage to his or the putative class members' properties. (*Id.* at 17).

In opposition, Plaintiff relies upon *Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d 233 (N.D.N.Y. 2017). *Baker* is one of several toxic tort cases involving perfluorooctanoic acid ("PFOA") in sources of drinking water. The *Baker* plaintiffs alleged that they had sustained property damage as a result of PFOA contamination and "personal injury from their ingestion of PFOA." *Id.* at 240 (footnote omitted). Although the plaintiffs' alleged property damages "include[d] the cost to remediate the contamination of their property, the loss of their use and enjoyment of the property, and a loss in their quality of life," the "largest source of damages" stemmed from the alleged "loss in their property values." *Id.* at 240-41.

In arguing that the plaintiffs failed to allege a "property-based injury sufficient to maintain a negligence claim," the *Baker* defendants also relied upon *532 Madison*. *Id.* at 244. Nonetheless, the *Baker* court found *532 Madison* to be inapposite, stating that the New York Court of Appeals did not "announce a talismanic requirement for plaintiffs to allege physical injury to their property. . . . Instead, the decision concerned the existence of a legal duty between the plaintiffs and defendants." *Id.* In distinguishing *532 Madison*, the *Baker* court broadly defined a party's duty in pollution cases, stating that "[s]ociety has a reasonable expectation that manufacturers avoid contaminating the surrounding environment, an expectation that extends to the pollution of an area's water supply." *Id.* at 245. The *Baker* court further noted that "nothing in *532 Madison* prevents a person whose water supply was contaminated by such conduct from recovering in tort, even if she seeks economic damages." *Id.* at 246.

*Baker* is more analogous to the instant matter than *532 Madison*. *Baker* and similar pollution cases involved conduct directly impacting the plaintiffs' property and a diminution in value traceable to the defendants' actions. Here, Defendant owed Plaintiff and the putative class members, as adjacent landowners, a duty of care to operate the Landfill in a reasonable manner. *See Fitzgibbons v. City of Oswego*, No. 5:10-CV-1038 FJS/ATB, 2011 WL 6218208, at *15 (N.D.N.Y. Dec. 13, 2011) (denying motion to dismiss negligence claim where the adjacent landowner alleged that the defendant "owed him a duty of care with regard to its operation of the [l]andfill").

Defendant's duty in this case is distinguishable from the more tenuous obligations and intangible losses asserted by the plaintiffs in *532 Madison*. While the financial loss

suffered by the businesses in *532 Madison* fell outside the zone of danger reasonably expected to be guarded against, Plaintiff and the putative class members in this case have a reasonable expectation that the operator of an adjacent landfill will take reasonable measures to prevent the unreasonable contamination of the immediate air space permeating their properties. Indeed, in concluding that the plaintiffs in *532 Madison* could not sustain their negligence cause of action, the New York Court of Appeals juxtaposed *Dunlop Tire & Rubber Corp. v. FMC Corp.*, 53 A.D.2d 150, 154-55 (4th Dep't 1976) where an explosion caused "direct physical contact" with a nearby property as well as financial losses due to lost electrical power—resulting in recoverable damages—and *Beck v. FMC Corp.*, 53 A.D.2d 118, 121 (4th Dep't 1976), *aff'd*, 42 N.Y.2d 1027 (1977), where the plaintiffs merely "sought damages for lost wages caused by" the closure of a manufacturing plant, *see 532 Madison*, 96 N.Y.2d at 290. The lost wages arising from the plant's temporary closure are far more akin to a loss in bargained-for-consideration for which the economic loss rule undoubtedly applies than the loss-in-value-damages resulting from the actual pollution of Plaintiff's property.

Defendant's attempts to distinguish *Baker* are unpersuasive. Defendant appears to argue that because Plaintiff does not plead "any constant fear of health consequences related to the odor[s]," *Baker* is inapplicable. (Dkt. 16 at 12). However, "[s]tigma resulting from serious health concerns or other injury" is not required in order for a case to fall within the realm of damages envisioned by *Baker* and other New York courts. (*See id.*). Instead, the critical requirement is the "actual pollution" of a plaintiff's property. *See Donavan*, 2017 WL 3887904, at *6. Whether the stigma results from odors, fears of electromagnetic

- 17 -

radiation, or industrial chemicals, the resulting economic damages may be sought through a negligence claim so long as the stigma-causing pollutant or emission "directly affected" a plaintiff's property or imminently risks contamination. *See id.* at \*4; *Baker*, 232 F. Supp. 3d at 246 ("Such a fear or stigma . . . must be traceable to the conduct of the defendant, and that conduct must in turn be connected with the property in question."); *see also Halliday*, 265 A.D.2d at 617; *Nalley*, 165 Misc. 2d at 810; *cf. Hanna*, 839 F. Supp. 2d at 680. Because Plaintiff alleges that the noxious odors permeate his property and the properties of the putative class members, the diminished market value of their respective properties may be pursued in a claim for ordinary negligence. *Cf. Donavan*, 2017 WL 3887904, at \*4 ("Because [the plaintiff] has not alleged contamination of his drinking water or the presence of PFOA on his property, the Court agrees with [d]efendants that [the plaintiff] has not adequately pleaded a claim of negligence or gross negligence for property damages. The Court reaches this conclusion because [the plaintiff] has not satisfied the duty prong, not, as [d]efendants urge, for failure to allege injury." (citation omitted)).

Therefore, Plaintiff has plausibly stated a claim for ordinary negligence based upon Defendant's alleged breach of its duty by causing the airspace on and surrounding Plaintiff's property to be contaminated, resulting in a diminution in property values. Defendant's motion to dismiss this claim is denied.

### B. Gross Negligence

"Gross negligence . . . differs in kind as well as degree from ordinary negligence." *Sutton Park Dev. Corp. Trading Co. Inc. v. Guerin & Guerin Agency Inc.*, 297 A.D.2d 430, 431 (3d Dep't 2002) (citing *Colnaghi, U.S.A., Ltd.*, 81 N.Y.2d at 823-24). "To constitute

gross negligence, 'the act or omission must be of an aggravated character, as distinguished from the failure to exercise ordinary care.'" *Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*, 204 F. Supp. 2d 639, 644 (S.D.N.Y. 2002) (quoting *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998)).

"On a motion to dismiss, a claim for gross negligence will be sustained only if the plaintiff alleges facts plausibly suggesting that the defendant's conduct 'evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing.'" *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 61 (2d Cir. 2012) (quoting *M+J Savitt, Inc. v. Savitt*, No. 08 Civ. 8535 (DLC), 2009 WL 691278, at *12 (S.D.N.Y. Mar. 17, 2009)). "Recklessness in the context of a gross negligence claim means 'an extreme departure from the standards of ordinary care,' such that 'the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* at 61-62 (quoting *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 454 (2d Cir. 2009)); *see Mali v. British Airways*, No. 17 Civ. 685 (KPF), 2018 WL 3329858, at *8 (S.D.N.Y. July 6, 2018) ("As such, 'a party is grossly negligent when it fails to exercise even slight care or slight diligence.'" (quoting *Goldstein v. Carnell Assocs., Inc.*, 74 A.D.3d 745, 747 (2d Dep't 2010))).

Plaintiff alleges that Defendant knew that it "improperly constructed, maintained and operated the [L]andfill and knew, or should have known upon reasonable inspection that such actions would cause Plaintiffs' property to be invaded by noxious odors." (Dkt. 4 at ¶ 48). According to Plaintiff, not only did Defendant fail "to exercise ordinary care,"

but it "knowingly allow[ed] conditions to exist which caused noxious odors to physically invade Plaintiffs' property. . . ." (*See id.* at ¶¶ 49-50).

Despite these conclusory allegations, Plaintiff has failed to set forth facts that, accepted as true, allege "an extreme departure from the standards of ordinary care" or the absence of "even slight care or slight diligence." *See Bayerische Landesbank, N.Y. Branch*, 692 F.3d at 61-62; *Mali*, 2018 WL 3329858, at *8 (quotation marks omitted). Instead of providing factual allegations demonstrating a reckless disregard for Plaintiff's rights, Plaintiff simply asserts that Defendant knowingly and/or intentionally failed to operate, maintain, or construct the Landfill in a manner consistent with its obligations of ordinary care. (*See* Dkt. 4 at ¶¶ 47-50). Simply appending conclusory words or phrases, such as "knowingly" or "intentionally," to allegations of ordinary negligence does not satisfy the aggravated nature of a gross negligence claim. *See Bayerische Landesbank, N.Y. Branch*, 692 F.3d at 62 ("Simply adding the conclusory word 'reckless' to Aladdin's trading does not transform an ill-advised investment decision into something approaching intentional misconduct."); *Kinsey v. Cendant Corp.*, No. 04 Civ.0582 RWS, 2005 WL 1907678, at *7 (S.D.N.Y. Aug. 10, 2005) (holding that allegations "sufficient to demonstrate ordinary negligence" do not necessarily allege a gross negligence claim without factual allegations sufficient to "meet the heightened standard necessary to state a claim for gross negligence"); *Sutton Park Dev. Corp. Trading Co. Inc.*, 297 A.D.2d at 431 ("Notably missing from this complaint are any factual averments alleging conduct of such aggravated character.").

Plaintiff argues that he has sufficiently alleged a claim for gross negligence because the Amended Complaint establishes that Defendant was on notice of the Landfill emissions for some time, and yet it continues to allow the odors to permeate the surrounding properties and it "has not taken all reasonable steps to fix" this problem. (Dkt. 14 at 7-8). The Amended Complaint alleges that the noxious odors are a widespread and ongoing problem, and that Defendant recognizes these emissions as unacceptable. (*See* Dkt. 4 at ¶¶ 13-18). Nonetheless, the Amended Complaint does not allege that Defendant "has not taken all reasonable steps to fix" the problem. And, in any event, whether one has taken *all* reasonable steps to resolve an issue is not the appropriate standard by which to evaluate a claim for gross negligence. While the failure to pursue reasonable remedies may be sufficient to support a claim for ordinary negligence, it is only the absence of "even slight care or slight diligence" that rises to the degree of recklessness necessary to sustain this cause of action. The Amended Complaint simply fails to set forth sufficient factual allegations that satisfy the heightened standard required to sustain a gross negligence cause of action, and this claim must be dismissed.

Therefore, Plaintiff's gross negligence cause of action is dismissed without prejudice for failure to state a claim.

## IV.    Plaintiff's Claims are Not Preempted by the Federal Clean Air Act

Defendant argues that even if Plaintiff has sufficiently stated New York common law causes of action, those claims are preempted by the federal Clean Air Act ("CAA"). (Dkt. 13-1 at 25-28). While the Second Circuit has not yet addressed this issue, the Third Circuit and the Sixth Circuit have both concluded that a *source state's* common law is not

preempted by the CAA. *See Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 686 (6th Cir. 2015) ("This interlocutory appeal concerns whether the federal Clean Air Act preempts common law claims brought against an emitter based on the law of the state in which the emitter operates. The Clean Air Act's text makes clear that the Act does not preempt such claims. This conclusion is further supported by the Act's structure and history, together with relevant Supreme Court precedents."); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 189-90 (3d Cir. 2013) ("On appeal, we are faced with a matter of first impression: whether the Clean Air Act preempts state law tort claims brought by private property owners against a source of pollution located within the state. Based on the plain language of the Clean Air Act and controlling Supreme Court precedent, we conclude that such source state common law actions are not preempted."). Furthermore, Defendant's reliance upon the Fourth Circuit's decision in *North Carolina, ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291 (4th Cir. 2010) is misplaced because *Cooper* involved the application of an *affected state's* common law to regulate source-state pollution. For the following reasons, this Court holds that the CAA does not preempt a source state's common law causes of action that mandate the imposition of more stringent requirements respecting the regulation of air pollution.

The CAA "has been referred to as a 'model of cooperative federalism.'" *Black v. George Weston Bakeries, Inc.*, No. 07-CV-853S, 2008 WL 4911791, at *4 (W.D.N.Y. Nov. 13, 2008) (quoting *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 467 (6th Cir. 2004)). Indeed, the CAA declares that "air pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3).

Accordingly, Congress enacted a "savings clause" permitting states to "adopt and enforce regulations limiting the emission of pollutants to the extent that such regulations are more stringent than the requirements of the Clean Air Act, subject to certain exceptions not relevant here." *Clean Air Mkts. Grp. v. Pataki*, 194 F. Supp. 2d 147, 157 (N.D.N.Y. 2002) (footnote omitted), *aff'd*, 338 F.3d 82 (2d Cir. 2003); *see generally* 42 U.S.C. § 7416 (allowing states or their political subdivisions "to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution" so long as that standard or requirement is no less stringent than any standards or requirements mandated by federal law).

In construing the CAA, courts have frequently referred to the federal Clean Water Act ("CWA") because "many provisions in the Clean Water Act—including the savings clauses—were modeled on the Clean Air Act. . . ." *Merrick*, 805 F.3d at 692; *see Bell*, 734 F.3d at 196 ("Ultimately, as commentators have recognized, there is little basis for distinguishing the Clean Air Act from the Clean Water Act—the two statutes feature nearly identical savings clauses and employ similar 'cooperative federalism' structures." (quotation omitted)); *see generally Moran v. Vaccaro*, 684 F. Supp. 1201, 1204 (S.D.N.Y. 1988) (noting that "[t]he citizen suit provision of the Clean Air Act contains the same 'alleged to be in violation' language as the Clean Water Act"); *Friends of the Earth v. Eastman Kodak Co.*, 656 F. Supp. 513, 515 n.1 (W.D.N.Y.) ("Because the Clean Water Act section under which this action is brought is virtually identical to § 304 of the Clean Air Act, there is no reason not to interpret it in the same manner."), *aff'd*, 834 F.2d 295 (2d Cir. 1987). The CWA's "savings clause" also permits "any State or political subdivision

thereof . . . to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution" that is no less stringent than any applicable standard or requirement set forth under federal law. 33 U.S.C. § 1370. The similarities between these two statutes are notable because the Supreme Court has already determined in *Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987), whether state common law claims are preempted by the CWA.

In *Ouellette*, "the Court was asked to determine whether the Clean Water Act preempted a Vermont common law nuisance suit filed in Vermont state court, where the source of the alleged injury was located in New York." *Bell*, 734 F.3d at 194. In other words, *Ouellette* involved a case of transboundary pollution; the source of the effluent was located in New York, but the pollution ended up on the Vermont-side of Lake Champlain. 479 U.S. at 483-84. Ultimately, the Supreme Court held that "the CWA precludes a court from applying the law of an affected State against an out-of-state source" because "if affected States were allowed to impose separate discharge standards on a single point source, the inevitable result would be a serious interference with the achievement of the 'full purposes and objectives of Congress.'" *Id.* at 493-94 (quoting *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985)). For example, "[i]f a New York source were liable for violations of Vermont law, that law could effectively override both the permit requirements and the policy choices made by the source State." *Id.* at 495. As such, "[a]pplication of an affected State's law to an out-of-state source also would undermine the important goals of efficiency and predictability in the permit system." *Id.* at 496.

However, the Supreme Court reached a different conclusion regarding the common law remedies recognized by a *source* State. *See id.* at 497 ("The saving clause specifically preserves other state actions, and therefore nothing in the Act bars aggrieved individuals from bringing a nuisance claim pursuant to the law of the *source* State."). The Court indicated that the CWA's savings clause permitted states "to impose higher standards on their own point sources," and that "this authority may include the right to impose higher common-law as well as higher statutory restrictions." *Id.*; *see Merrick*, 805 F.3d at 690 ("State courts are arms of the 'State,' and the common law standards they adopt are requirement[s] respecting control or abatement of air pollution." (quotation marks omitted)). The "application of the source State's law does not disturb the balance among federal, source-state, and affected-state interests"; because "the Act specifically allows source States to impose stricter standards, the imposition of source-state law does not disrupt the regulatory partnership established by the permit system." *Ouellette*, 479 U.S. at 498-99. While acknowledging that "New York nuisance law may impose separate standards and thus create some tension with the permit system," *Ouellette* indicated that this source-state rule "prevents a source from being subject to an indeterminate number of potential regulations" because "a source only is required to look to a single additional authority, whose rules should be relatively predictable." *Id.*

Since the CAA's savings clause permits States to "adopt or enforce . . . *any requirement* respecting control or abatement of air pollution" that is no less stringent than any required by federal law, *see* 42 U.S.C. § 7416 (emphasis added), Plaintiff's source-state common law claims are not preempted by the CAA's comprehensive regulatory

- 25 -

program, *see Ouellette*, 479 U.S. at 497-99; *see also Merrick*, 805 F.3d at 690 ("An expansive reading of 'any requirement' is consistent, moreover, with the Court's historical tendency to treat common law standards as 'requirements' for purposes of a variety of statutes."); *see generally Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 443 (2005) (stating that "the term 'requirements' in § 136v(b) [of the Federal Insecticide, Fungicide, and Rodenticide Act] reaches beyond positive enactments, such as statutes and regulations, to embrace common-law duties").

Defendant argues that the assertion of common law claims and the imposition of any corresponding injunctive relief would disrupt the regulatory framework set up by the CAA and its permitting system. (Dkt. 13-1 at 26-27). In this respect, Defendant contends that "if successful, Plaintiff's lawsuit could force Waste Management to engage in actions that conflict with its permit" because Plaintiff "seeks injunctive relief above and beyond what is already required under Waste Management's Title V permit." (*Id.* at 28; *see* Dkt. 4 at 11 (demanding "[i]njunctive relief outside of that which is required by Defendant's Federal and State issued Air Permits")).

However, *Ouellette*'s explanation as to why source-state common law claims do not undermine the CWA's comprehensive regulatory framework applies with equal force to Defendant's arguments in the CAA context. Defendant cites to one Northern District of New York decision for the proposition that state law requirements are preempted where the plaintiff "attempt[s] to require [the] defendant to conduct additional or different remediation than [the] state agency require[s]." (Dkt. 13-1 at 28 (citing *Bartlett v. Honeywell Int'l, Inc.*, 260 F. Supp. 3d 231, 246 (N.D.N.Y. 2017))). However, *Bartlett*

involved the provisions of the federal Comprehensive Emergency Response, Compensation and Liability Act ("CERCLA"), which pertains to a wholly different environmental statutory scheme from that structured by either the CAA or the CWA. In addition, the *Bartlett* plaintiffs sought to hold the defendant liable for actions "that were consistent with the Consent Decree" entered between the defendant and the NYSDEC. *Bartlett*, 260 F. Supp. 3d at 240. Had the defendant "engaged in any alternative remedial measures," it "would have violated CERCLA § 122(e)(6)." *Id.* In other words, the *Bartlett* court found the plaintiffs' claims were preempted because the plaintiffs were "attempting to hold [the d]efendant liable for activities consistent with the Consent Decree on the theory that [the d]efendant should have conducted additional remediation that would have violated CERCLA § 122(e)(6)." *Id.* at 243. *Bartlett* is distinguishable because unlike § 122(e)(6) of CERCLA, the CAA specifically preserves the States' authority to adopt and enforce more stringent standards than those imposed by federal law. *Compare* 42 U.S.C. § 9622(e)(6) ("When either the President, or a potentially responsible party pursuant to an administrative order or consent decree under this chapter, has initiated a remedial investigation and feasibility study for a particular facility under this chapter, *no potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized by the President*." (emphasis added)), *with* 42 U.S.C. § 7416 (retaining the authority in any State or the political subdivisions thereof to "adopt or enforce" emissions standards and limitations or "any requirement respecting control or abatement of air pollution" so long as that standard or requirement is no less stringent than any required by federal law).

- 27 -

Defendant also relies upon the Fourth Circuit's decision in *North Carolina, ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291 (4th Cir. 2010). Like *Ouellette*, *Cooper* involved transboundary pollution issues. North Carolina sought an injunction to require the installation of pollution control devices in certain coal-fired power plants located in Alabama and Tennessee, whose air emissions were blown eastward into North Carolina and other states by prevailing winds. *See id.* at 296-97. And, as in *Ouellette*, the Fourth Circuit also concluded that the affected state's common law was preempted by the CAA. *See id.* at 308 ("The Supreme Court emphasized that only source state law, here that of Alabama and Tennessee, could impose more stringent emission rates than those required by federal law on plants located in those two jurisdictions. Yet exactly the opposite has happened. North Carolina explicitly stated that it wanted out-of-state entities, including [the Tennessee Valley Authority ("TVA")], to follow its state rules." (citation omitted)).[4]

---

[4]     In dicta, *Cooper* suggests that "even if the district court actually applied source state law from Alabama and Tennessee, it would be difficult to uphold the injunctions because TVA's electricity-generating operations are expressly permitted by the states in which they are located." 615 F.3d at 309. The Fourth Circuit stated that no public nuisance action exists under either Tennessee or Alabama common law for conduct that is authorized or permitted by law. *Id.* at 309-10. Under New York law, "[i]t is settled that an otherwise lawful business, even one operating in conformity with relevant statutory requirements, may be enjoined when it creates or contributes to a public nuisance because of the manner or circumstances in which it operates." *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 280 (E.D.N.Y. 2004); *see AcuSport, Inc.*, 271 F. Supp. 2d at 484-85 (same). While an exception to this New York rule exists "where the specific conduct at issue is 'fully authorized by statute, ordinance or administrative regulation,'" *Beretta U.S.C. Corp.*, 315 F. Supp. 2d at 281 (quoting Restatement (Second) of Torts § 821B, cmt. f), since the NYSDEC has issued a "Notice of Violation" and communicated with Defendant regarding odor abatement actions there is at least an unresolved question of fact as to whether this exception would apply in this case. In any event, a careful review of *Cooper* indicates that it is not in tension with the holdings in *Merrick*, *Bell*, or *Ouellette*. *See Cooper*, 615 F.3d

Accordingly, the result in *Cooper* is actually consistent with this Court's application of *Ouellette* to the CAA context at issue in this matter.

Therefore, in light of the CAA's statutory text, the holdings in *Merrick* and *Bell*, and reference to the analogous provisions of the CWA and the Supreme Court's decision in *Ouellette*, this Court concludes that Plaintiff's source-state common law causes of action are not preempted by the CAA.

## V.    The Doctrine of Primary Jurisdiction

Defendant also argues that the doctrine of primary jurisdiction requires the Court to dismiss or stay Plaintiff's request for injunctive relief because the NYSDEC "is already directing and supervising an ongoing action plan related to the odors." (Dkt. 13-1 at 28; *see id.* at 28-30). At oral argument, the parties indicated that a community organization known as Fresh Air for the Eastside ("FAFES"),[5] which is composed of at least some of the putative class members, has filed a petition with the NYSDEC to modify Defendant's permit obligations. However, subsequent to the oral argument, the NYSDEC issued its response to FAFES' petition. *See High Acres Landfill*, Dep't of Envtl. Conservation, https://www.dec.ny.gov/chemical/113037.html (last visited Mar. 25, 2019). Because the

---

at 306 ("There is no question that the law of the states where emissions sources are located, in this case Alabama and Tennessee, applies in an interstate nuisance dispute. The Supreme Court's decision in *Ouellette* is explicit: a 'court must apply the law of the State in which the point source is located.' While *Ouellette* involved a nuisance suit against a source regulated under the Clean Water Act, *all parties agree its holding is equally applicable to the Clean Air Act*." (citation omitted) (emphasis added)).

[5]    FAFES subsequently filed an action concerning the Landfill's emissions that is currently pending before the undersigned. *See Fresh Air for the Eastside, Inc. v. Waste Mgmt. of N.Y., L.L.C.*, Case No. 6:18-cv-06588, Dkt. 1 (W.D.N.Y. Aug. 14, 2018).

NYSDEC has issued its response, several of Defendant's arguments in support of the application of this doctrine appear to be rendered inapplicable. *See, e.g., In re Kind LLC "Healthy & All Natural" Litig.*, No. 15-MC-2645 (WHP), 2019 WL 542834, at *2 (S.D.N.Y. Feb. 11, 2019) ("This Court also stayed the 'non-GMO' claims pursuant to the primary jurisdiction doctrine pending [the United States Department of Agriculture ("USDA")] rulemaking. And . . . the USDA promulgated 'non-GMO' rules . . . on December 21, 2018, which [became] effective February 19, 2019. Accordingly, there is no longer a basis for staying the 'non-GMO' claims." (citations omitted)); *Bhanusali v. Orange Reg'l Med. Ctr.*, No. 10-CV-6694 CS, 2013 WL 4828657, at *3 (S.D.N.Y. Aug. 12, 2013) ("Because the [Public Health and Health Planning Council of the New York State Department of Public Health] made its ruling on March 2, 2012, the doctrine of primary jurisdiction no longer presents a bar to consideration of the merits of [p]laintiffs' antitrust claims." (citation omitted) (footnote omitted)), *aff'd in part, vacated in part*, 572 F. App'x 62 (2d Cir. 2014); *Geo Grp., Inc. v. Cmty. First Servs., Inc.*, No. 11-CV-1711 CBA, 2012 WL 1077846, at *10 (E.D.N.Y. Mar. 30, 2012) ("[D]efendants moved in the alternative for 'stay or dismissal pursuant to the doctrine of primary jurisdiction pending the resolution of [the plaintiff]'s bid protest.' As explained above, there is no longer any other pending legal action arising out of this dispute. Accordingly, stay or dismissal on this ground is not appropriate." (citation omitted)).

While it appears the NYSDEC has denied each and every one of FAFES' requests to modify Defendant's permit requirements, the NYSDEC's response is a bit more nuanced. The NYSDEC has also imposed additional obligations on Defendant that the

agency anticipates will become enforceable permit requirements upon approval, and at least one of the FAFES' requests was denied "at this time, subject to a review" of an additional waste study. As such, some further action or assessment may still be required. The Court acknowledges that no briefing has been submitted regarding what impact the NYSDEC's response has on the Court's primary jurisdiction analysis. Nonetheless, the Court declines to invoke the doctrine of primary jurisdiction for the reasons that follow.

"The doctrine of primary jurisdiction 'comes into play whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.'" *Town of New Windsor v. Avery Dennison Corp.*, No. 10-CV-8611 (CS), 2012 WL 677971, at *8 (S.D.N.Y. Mar. 1, 2012) (quoting *Johnson v. Nyack Hosp.*, 964 F.2d 116, 122-23 (2d Cir. 1992)). This doctrine serves two primary purposes: "the desire for uniformity and the reliance on administrative expertise. Thus, in determining whether to apply the primary jurisdiction doctrine, [courts] must examine whether doing so would serve either of these purposes." *Tassy v. Brunswick Hosp. Ctr., Inc.*, 296 F.3d 65, 68 (2d Cir. 2002) (footnote omitted); *see also Ellis v. Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006) ("The doctrine's central aim is to allocate initial decisionmaking responsibility between courts and agencies and to ensure that they 'do not work at cross-purposes.'" (quoting *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 97 (2d Cir. 1996))).

"Whether there should be judicial forbearance hinges therefore on the authority Congress delegated to the agency in the legislative scheme." *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 59 (2d Cir. 1994); *see Gen. Elec. Co. v. MV Nedlloyd*,

- 31 -

817 F.2d 1022, 1026 (2d Cir. 1987) ("[W]hen Congress has entrusted the regulation of certain subject matter under a statute to an administrative agency, it is often counterproductive for a court to act upon that subject matter without the benefit of knowing what the agency has to offer."). "Recourse to the doctrine of primary jurisdiction is thus appropriate 'whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.'" *Ellis*, 443 F.3d at 81 (quoting *United States v. W. Pac. R. Co.*, 352 U.S. 59, 64 (1956)).

Four factors must be weighed in determining whether the doctrine of primary jurisdiction should be invoked:

(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;

(2) whether the question at issue is particularly within the agency's discretion;

(3) whether there exists a substantial danger of inconsistent rulings; and

(4) whether a prior application to the agency has been made.

*Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 46 F.3d 220, 222 (2d Cir. 1995). In a post-hearing submission, Defendant points to the analysis of these four factors in *Read v. Corning Inc.*, 351 F. Supp. 3d 342, 2018 WL 6710925 (W.D.N.Y. 2018), a recent decision that Defendant believes supports its position that the doctrine of primary jurisdiction is applicable under the circumstances of this case (Dkt. 31). *Read* involved an action by property owners who asserted New York common law and CERCLA claims for damages and "response costs," respectively, for the alleged contamination of their property by

"hazardous substances." *Read*, 2018 WL 6710925, at *1. However, the application of these four factors to the facts presented indicate that neither a stay nor a dismissal of Plaintiff's injunctive relief is appropriate, and that *Read* is inapposite.

Here, the first factor weighs against the application of the primary jurisdiction doctrine because "Plaintiff's lawsuit is based on common law causes of action commonly adjudicated by courts, and will not require extensive interpretation of agency regulations." *Avery Dennison Corp.*, 2012 WL 677971, at *9; *see Sullivan v. Saint-Gobain Performance Plastics Corp.*, 226 F. Supp. 3d 288, 297 (D. Vt. 2016) ("The questions raised by [the p]laintiffs' state-law tort claims are all within the conventional expertise of judges."); *Martin v. Shell Oil Co.*, 198 F.R.D. 580, 585 (D. Conn. 2000) ("Although the resolution of the issues in this case undoubtedly will require some technical analysis, the claims—for example, whether Shell breached a duty to the plaintiffs, whether Shell trespassed or created a nuisance on the plaintiffs' property, whether Shell defrauded the plaintiffs, or whether Shell was willful, wanton or reckless in its actions toward the plaintiffs—are all of a type commonly adjudicated by the courts."); *Luckey v. Baxter Healthcare Corp.*, No. 95 C 509, 1996 WL 242977, at *6 (N.D. Ill. May 9, 1996) ("[A]lthough the case will necessarily involve technical questions concerning the quality of plasma testing procedures and plasma products, this case . . . is comparable to myriad tort actions that regularly require this Court to resolve complex technical issues."). "While NYSDEC of course has greater technical expertise than the Court in environmental matters, . . . such expertise will [not] be required to determine liability in this case, and [this Court] decline[s] to defer to NYSDEC simply because this case touches upon technical environmental issues." *Avery*

*Dennison Corp.*, 2012 WL 677971, at *9 (citations omitted); *see Martin*, 198 F.R.D. at 585-86 ("Although the [Connecticut Department of Environmental Protection (the "CTDEP")] undoubtedly possesses expertise in the area of environmental pollution, the defendant has not persuaded this court that the CTDEP's expertise is essential in adjudicating the matters at hand.").

In contrast to the claims alleged in this case, the *Read* plaintiffs not only asserted common law causes of action but also requested relief pursuant to CERCLA, a highly technical environmental statute that Congress enacted "in response to the serious environmental and health risks posed by industrial pollution," and which was intended "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (quotation omitted). Considering that the NYSDEC is "responsible . . . for inactive hazardous waste disposal site remedial programs" in New York State, N.Y. Envtl. Conserv. Law § 27-1313(1)(a), it is not surprising that the *Read* court found those issues to involve "technical or policy considerations within the agency's particular field of expertise," *Read*, 2018 WL 6710925, at *7. Therefore, the first factor weighs against the application of primary jurisdiction.

With respect to the second factor, in evaluating whether the issues presented fall "particularly within the agency's discretion," the Court recognizes that the NYSDEC has been tasked with controlling air pollution throughout New York State. *See* N.Y. Envtl. Conserv. Law § 19-0301. Moreover, the United States Environmental Protection Agency "has delegated to [NYS]DEC the authority to issue and modify clean air permits under

Title V of the Clean Air Act." *Glob. Cos. LLC v. N.Y. State Dep't of Envtl. Conservation*, 155 A.D.3d 93, 97 (3d Dep't 2017), *leave to appeal denied*, 30 N.Y.3d 913 (2018); *see* 42 U.S.C. § 7661a(d)(1); N.Y. Envtl. Conserv. Law § 19-0311(1).

Ensuring compliance with state and federal air pollution requirements falls squarely within the discretion of the NYSDEC. Indeed, it is NYSDEC's responsibility to "carry out the environmental policy of the state," *see* N.Y. Envtl. Conserv. Law § 3-0301(1), which requires that state agency to, among other things, "conserve, improve and protect its natural resources and environment and to prevent, abate and control water, land and air pollution, in order to enhance the health, safety and welfare of the people of the state and their overall economic and social well being," *id.* § 1-0101(1). However, the NYSDEC is not responsible for vindicating private property rights or providing remedies for landowner disputes. *See Lombardozzi v. Taminco US Inc.*, No. 3:15CV533/MCR/EMT, 2016 WL 4483856, at *2 (N.D. Fla. Aug. 24, 2016) (noting that while the Florida Department of Environmental Protection "is charged with enforcing Florida's environmental statutes," the agency "has no authority to vindicate individual property rights such as those asserted by [the p]laintiffs in this case"); *Martin*, 198 F.R.D. at 587 ("[T]he CTDEP is charged with protecting the environment for the public's health and safety. It does not have the purpose of vindicating individual property rights such as those asserted by the plaintiffs in this case."); *see also Massa v. Peabody Coal Co.*, 698 F. Supp. 1446, 1451 (S.D. Ind. 1988) (noting that the plaintiff's common law claims "suggest that even if [the defendant] is in compliance with the agency standards," it may still be acting "in violation of other

standards arising out of the common law, wholly independently from the agency regulations").

Plaintiff's Amended Complaint does not clearly set forth exactly what type of injunctive relief is contemplated by this action. The operative pleading merely requests injunctive relief "outside of that which is required by Defendant's Federal and State issued Air Permits." (Dkt. 4 at 11). At oral argument, Plaintiff's counsel indicated that Plaintiff generally requests the Landfill odors cease to pollute Plaintiff's and the putative class members' properties, but counsel declined to provide a more specific response until the case proceeded past discovery. Although Plaintiff is not preempted from asserting a New York common law claim that requests injunctive relief more stringent than that required by Defendant's CAA permit and federal law, any injunctive relief that might interfere with Defendant's compliance with those federal requirements could very well be precluded. Nonetheless, the mere possibility that a common law standard may require *different* injunctive relief than that currently prescribed by the CAA does not by itself place this issue within the NYSDEC's exclusive domain. *See Massa*, 698 F. Supp. at 1451 ("Although the possibility exists that some of Peabody's blasting and mining conduct may be subject to revision if these common law standards are breached, those changes would not properly fall within the exclusive authority of the Indiana regulatory agencies."). Therefore, given the limited definition of the injunctive relief sought by Plaintiff, the second primary jurisdiction factor does not weigh in favor of or against the application of the primary jurisdiction doctrine in this case.

In turning to the third primary jurisdiction factor, the Court is unpersuaded that there is a "substantial danger of inconsistent rulings" between this Court and the NYSDEC. Whether or not Defendant is in compliance with its regulatory responsibilities is not necessarily dispositive of whether Plaintiff and the putative class members are suffering property damage or are otherwise being deprived of their right to the use and enjoyment of their property. *See generally Avery Dennison Corp.*, 2012 WL 677971, at *10 ("[W]hile it is conceivable that NYSDEC factual findings may help to inform this Court, I do not believe at this point that any are necessary for me to make legal rulings, nor will any such ruling necessarily conflict with any factual finding."); *Martin*, 198 F.R.D. at 586 ("The court is unaware, for example, of any minimum amount of a foreign substance that must be found on a plaintiff's property in order for that plaintiff to state a claim for trespass. A trespass is a trespass, and no ruling as to whether the defendants trespassed on the plaintiffs' property will necessarily conflict with any finding of the state agency."). Furthermore, that NYSDEC has rejected FAFES' requests to modify Defendant's permit obligations, presumably because many of the agency's concerns have been addressed to its satisfaction, does not preclude the imposition of additional abatement measures. *See generally Interfaith Cmty. Org. Inc. v. PPG Indus., Inc.*, 702 F. Supp. 2d 295, 312 (D.N.J. 2010) ("The fact that [the defendant] may be subject to a more stringent remediation standard than it is under the Consent Judgment is not a reason to invoke the primary jurisdiction doctrine."); *Maine People's All. v. Holtrachem Mfg. Co.*, No. CIV. 00-69-B-C, 2001 WL 1602046, at *8 (D. Me. Dec. 14, 2001) ("Extra burden is not what the doctrine is meant to

circumvent; additional obligation is not incompatible with nor does it undermine the agency-driven process.").

Moreover, Plaintiff's claims are not based upon the CAA or the permits issued to Defendant. The federal requirements set forth by the CAA establish a regulatory floor, rather than a ceiling, upon which a source state may impose more stringent requirements to abate the emission of air pollution. Defendant takes the position that an award of any injunctive relief would be inconsistent with the NYSDEC's resolution of FAFES' petition. This is simply not so. That Plaintiff seeks injunctive relief different—i.e., more stringent— than that required by Defendant's permit requirements does not mean that such relief will necessarily be inconsistent with Defendant's federal obligations.

*Read* provides no additional support for Defendant's position. In *Read*, the NYSDEC issued a "Final Decision Document" that "set[] forth a remedy for the subject area." 2018 WL 6710925, at *2. Subsequently, the NYSDEC entered into an "Order on Consent and Administrative Settlement" that required the remedial activities set forth in the Final Decision Document to be implemented by the defendant. *Id.* Because the *Read* plaintiffs challenged the sufficiency of this remedy, the court determined that the defendant could find "itself whipsawed between two different remedies ordered by two different entities, each with jurisdiction over the matter." *Id.* at *7. Again, since the regulatory framework set forth by the CAA is different from that established under CERCLA, *Read* is inapposite. Unlike CERCLA, the CAA specifically anticipates that source-state common law rules may impose more stringent regulatory requirements than those mandated by federal law. *See generally Bartlett*, 260 F. Supp. 3d at 240 (noting that a party that engages

- 38 -

in "alternative remedial measures" from those set forth in a duly issued consent decree between that party and the NYSDEC would violate CERCLA). Indeed, that is the precise argument the court rejected in *Read*. *See Read*, 2018 WL 6710925, at *7 ("They want the Court to order a literally more extensive remedy. At oral argument, plaintiffs' attorney expressly stated that in plaintiffs' view, the remedy 'should be more' than what was approved by the [NYS]DEC."). Therefore, the third primary jurisdiction factor also weighs against the application of this doctrine.

The last primary jurisdiction factor requires the Court to determine "whether a prior application to the agency has been made." Plaintiff seeks "[i]njunctive relief outside of that which is required by Defendant's Federal and State issued Air Permits." (Dkt. 1 at 10). Since FAFES' petition sought to modify Defendant's permit obligations, a "prior application" to obtain relief beyond that currently required by those permits has arguably already been made. Nevertheless, construing FAFES' petition as such does not warrant the application of the doctrine of primary jurisdiction. Whereas the *Read* court determined that recourse through the courts would serve no purpose after the NYSDEC "ha[d] actually approved a specific remedy," *Read*, 2018 WL 6710925, at *7 ("Late-in-the-day meddling by this Court would serve little if any useful purpose."), the NYSDEC's resolution of FAFES' petition does not prevent more stringent common law requirements from being imposed upon Defendant's operation of the Landfill, *see Merrick*, 805 F.3d at 690-91 (noting that "the Supreme Court has interpreted the word 'State' in the Clean Water Act states' rights savings clause . . . to cover state courts and the common law rules they shape," and concluding that "[s]tate common law standards are . . . 'requirements' adopted by

'States'" in the context of the CAA as well (citations omitted)). Furthermore, the Court now has the benefit of the NYSDEC's response to that "prior application" in considering Plaintiff's request for injunctive relief. At this time, it does not appear that FAFES' petition or the NYSDEC's response will impede the Court's ability to craft an appropriate injunctive remedy should Plaintiff ultimately prevail in this matter. Additionally, "Plaintiff seeks damages here, and 'courts generally do not defer jurisdiction where plaintiffs seek damages for injuries to their property or person.'" *Avery Dennison Corp.*, 2012 WL 677971, at \*10 (quoting *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 175 F. Supp. 2d 593, 618 (S.D.N.Y. 2001) (applying this principle in declining to dismiss the plaintiff's claims requesting *both* injunctive relief and damages)); *see also Martin*, 198 F.R.D. at 587 (finding that "an application to the CTDEP would not necessarily result in a vindication of the plaintiffs' rights," in part because the CTDEP "does not have the purpose of vindicating individual property rights such as those asserted by the plaintiffs in this case"). Therefore, the fourth factor also weighs against the application of the primary jurisdiction doctrine.

Finally, in addition to the four factors set forth above, "[c]ourts must also weigh 'the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings.'" *Avery Dennison Corp.*, 2012 WL 677971, at \*9 (quoting *Nat'l Commc'ns Ass'n, Inc.*, 46 F.3d at 222). There is little if any benefit to be had from staying or striking Plaintiff's requested injunctive relief at this time. It is not entirely clear exactly what type of injunction Plaintiff seeks and how that remedy juxtaposes with the CAA's requirements. As Defendant's counsel acknowledged at oral

argument, the NYSDEC has pursued no formal enforcement actions, outside its issuance

of the initial Notice of Violation,[6] and at least one abatement action is apparently still

outstanding. For these reasons, any advantage derived from the primary jurisdiction

doctrine does not outweigh the potential for unnecessary delay that could result from its

application to this case.

Based upon the foregoing, the Court declines to apply the doctrine of primary

jurisdiction to stay or strike the request for injunctive relief in the Amended Complaint.

## VI.   **Political Question Doctrine**

Lastly, Defendant argues that Plaintiff's state law claims raise a political question

that is not justiciable before this Court. (Dkt. 13-1 at 30-32). "The political question

doctrine calls for a careful and delicate analysis into whether a 'matter has been committed

by the Constitution to another branch of government or whether the action of that branch

exceeds whatever authority has been committed.'" *In re MTBE Prod. Liab. Litig.*, 438 F.

Supp. 2d 291, 295 (S.D.N.Y. 2006) (quoting *Baker v. Carr*, 369 U.S. 186, 211 (1962)).

"The Judiciary is particularly ill suited to make such decisions, as courts are fundamentally

underequipped to formulate national policies or develop standards for matters not legal in

---

[6]     On February 2, 2018, the NYSDEC issued a Notice of Violation to Defendant, detailing various conditions and actions that the agency deemed necessary for Defendant to return to a state of regulatory compliance, and the NYSDEC continued to communicate with Defendant regarding the status of these emissions for a number of months. *See High Acres Landfill*, Dep't of Envtl. Conservation, https://www.dec.ny.gov/chemical/113037.html (last visited Mar. 25, 2019). Nonetheless, the Notice of Violation is not an enforceable order. *See* N.Y. Envtl. Conserv. Law § 19-0505; *cf. Collins v. Olin Corp.*, 418 F. Supp. 2d 34, 46 (D. Conn. 2006) ("[B]ecause the [CT]DEP is actively overseeing the implementation of the consent order, the doctrine of primary jurisdiction counsels in favor of dismissal.").

nature." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986) (quotation omitted). Political questions are those that "lie beyond the competence and proper institutional role of the federal courts." *Belgrade v. Sidex Int'l Furniture Corp.*, 2 F. Supp. 2d 407, 415 (S.D.N.Y. 1998).

The Supreme Court has set forth six factors to evaluate in determining whether an issue is a nonjusticiable political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217; *see Vieth v. Jubelirer*, 541 U.S. 267, 277-78 (2004) (stating that these are "six independent tests for the existence of a political question" and that they "are probably listed in descending order of both importance and certainty").

Defendant has failed to articulate how any of these factors demonstrate the existence of a political question in this case. The Third Circuit directly addressed a similar argument in *Bell*, where the court rejected the contention that the common law claims at issue were barred by the CAA under the political question doctrine. The *Bell* court explained that "[n]o court has ever held that such a constitutional commitment of authority regarding the redress of individual property rights for pollution exists in the legislative branch. Indeed, if such a commitment did exist, the Supreme Court would not have decided *Ouellette* in

- 42 -

the first place." *Bell*, 734 F.3d at 198. This rationale applies with equal force to the facts presented here.

Furthermore, Defendant's case citations are inapposite. Defendant primarily relies upon past attempts to combat global climate change through common law remedies. *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 426 (2011) ("The critical point is that Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions from power plants; the delegation is what displaces federal common law. Indeed, were EPA to decline to regulate carbon-dioxide emissions altogether at the conclusion of its ongoing § 7411 rulemaking, the federal courts would have no warrant to employ the federal common law of nuisance to upset the agency's expert determination."); *Comer v. Murphy Oil USA, Inc.*, 839 F. Supp. 2d 849, 864 (S.D. Miss. 2012) ("It is unclear how this Court or any jury, regardless of its level of sophistication, could determine whether the defendants' emissions unreasonably endanger the environment or the public without making policy determinations that weigh the harm caused by the defendants' actions against the benefits of the products they produce. Our country, this Court, and even the plaintiffs themselves rely on the products the defendants produce."), *aff'd*, 718 F.3d 460 (5th Cir. 2013). The regulation of greenhouse gases is a complex issue involving numerous policy decisions, including national questions of energy production and transportation infrastructure as well as personal choices of consumption. The blunt instruments of traditional common law may be inadequately refined to address such broad and pervasive issues in modern society. However, determining whether a landfill operator is liable for property damages arising from the emission of noxious odors is not an issue

committed to one of the coordinate political branches; rather, it falls well within the traditional competency of the Judiciary to adjudicate.

Therefore, the Court rejects Defendant's assertion of the political question doctrine.

## VII.   Request for Leave to Amend

Finally, in the last sentence of Plaintiff's opposition papers, he states that "should the Court grant any portion of Defendant's motion, Plaintiff respectively requests leave to amend his complaint." (Dkt. 14 at 15).  Plaintiff does not explain why leave to amend is warranted or how any pleading defects would be cured.

Plaintiff's cursory request is procedurally defective under the Local Rules of Civil Procedure. *See Wi3, Inc. v. Actiontec Elecs.*, 71 F. Supp. 3d 358, 363 (W.D.N.Y. 2014) (finding request for leave to amend defective for failure to comply with Local Rules of Civil Procedure); *see also Food Holdings Ltd. v. Bank of Am. Corp.*, 423 F. App'x 73, 76 (2d Cir. 2011) (finding district court did not abuse its discretion in denying leave to amend complaint when request to amend was made "on the final page of their brief in opposition to defendants' motion to dismiss, in boilerplate language and without any explanation as to why leave to amend was warranted" and collecting cases).  Local Rule 15(a) provides that "[a] movant seeking to amend or supplement a pleading must attach an unsigned copy of the proposed amended pleading as an exhibit to the motion," and Local Rule 15(b) requires parties represented by counsel to identify the proposed amendments "through the use of a word processing 'redline' function or other similar markings. . . ." L.R. Civ. P. 15(a), (b).  Because Plaintiff has failed to comply with the Local Rules, the Court exercises its discretion in denying this "cursory or boilerplate request[ ] . . . made solely in a

memorandum in opposition to a motion to dismiss." *Malin v. XL Capital, Ltd.*, 312 F.

App'x 400, 402 (2d Cir. 2009) (citation omitted). If Plaintiff wishes to seek leave to amend

his Amended Complaint, he should do so through a procedurally-compliant motion.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss (Dkt. 13) is granted to the

extent that Plaintiff's nuisance and gross negligence causes of action are dismissed without

prejudice for failure to state a claim, but it is otherwise denied.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:    March 25, 2019
           Rochester, New York