**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| JAMES W. D'AMICO on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 6:18-cv-06080-EAW |
| vs. | ) ) | |
| WASTE MANAGEMENT OF NEW YORK, LLC, | ) ) ) | |
| Defendant. | ) | |

**DECLARATION OF NICHOLAS A. COUSON IN SUPPORT OF**
**PLAINTIFF JAMES W. D'AMICO'S**
**MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

I, Nicholas A. Coulson, do hereby declare as follows:

1.      I am an attorney licensed to practice in the State of Michigan with a State Bar of Michigan Identification No. 78001 and am also admitted to the bar of this Court.

2.      I have personal knowledge of the facts stated below and, if called as a witness at the time of any proceeding, could and would testify thereto. I make this declaration in support of Plaintiff James W. D'Amico's Motion for Preliminary Approval of Class Action Settlement.

3.      I have been a member in good standing of the State Bar of Michigan since 2013. I have never been suspended, disbarred, or disciplined.

4.      I am a partner at the law firm of Liddle & Dubin, P.C. I and my firm devote nearly all of our practice to prosecuting class actions, the majority of which relate to environmental class actions. I have represented certified classes in numerous cases involving nuisance odors, many of which have involved landfills or similar waste facilities.

5.      I am admitted to practice before the United States District Courts for United States District Courts for the Eastern District of Michigan, Western District of Michigan, Eastern District of

1

Wisconsin, Western District of New York, Northern District of Illinois, District of Colorado, and the United States Courts of Appeals for the Third and Fifth Circuits. I have also appeared *pro hac vice* in courts in many states, including Texas, Pennsylvania, Florida, California, Rhode Island, Ohio, Indiana, Wisconsin, Oregon, Washington, Massachusetts, and Kansas.

6.     I have been appointed as class counsel in dozens of cases by courts in various jurisdictions. Recent cases in which I have been appointed by courts to represent certified plaintiff classes include, without limitation:

*Clark-Floyd Landfill, LLC v. Gonzalez*, No. 19A-CT-2680, 2020 Ind. App. LEXIS 257, at *21 (Ct. App. June 18, 2020) (certification affirmed on appeal); *Ross, et al. v. USX Company*, Case No. G.D. 17-008663 (Allegheny Cty., PA Ct. of Common Pleas); *Bright et al v. Wake County Disposal, LLC*, Case No. 18-cvs-10976 (Wake Cty. NC Superior Ct.); *Michaely v. Browning-Ferris Industries of California, Inc.* (California Superior- Los Angeles Case No. BC497125 2019); *Batties v. Waste Management of Pennsylvania, LLC*, No. 14-7013, 2016 U.S. Dist. LEXIS 186335, at *47 (E.D. Pa. May 11, 2016); *Beck v. Stony Hollow Landfill, Inc.,* No. 3:16-cv-455, 2018 U.S. Dist. LEXIS 199221, (S.D. Ohio Nov. 26, 2018); *Johnston, et al. v. Deffenbaugh Disposal, Inc*., Case No: 2:16-cv-02648-JTM-KGG (D. Kan.) (thousands of residents near landfill); *Brown v. Rhode Island Resource Recovery Corporation*, C.A. NO. PC 2015-0947 (Rhode Island Superior 2018); *McCarty v. Okla. City Landfill, LLC,* No. CIV-12-1152-C (W.D. Okla. April 11, 2016); *Ng. v. International Disposal Corp. of California*, Case No. 112CV228591 (Santa Clara CA Superior Court Aug. 1, 2016); *Connors v. AmeriTies West, LLC,* (Wasco County Oregon Case No. 16-CV-25390, 2018); *Gingrasso, et al. v. Cedar Grove Composting Facility, Inc*., (King County (WA) Superior Court Case No: 13-2-05334-9 KNT, 2018);

*Bundy, et al. v. Cedar Grove Composting Facility, Inc.,* Snohomish County (WA) Superior Court Case No: 13-2-02778-8, 2018) (thousands of residents near composting facility); *Averett v. Metalworking Lubricants Co.,* No. 1:15-cv-01509-JMS-MPB, 2017 U.S. Dist. LEXIS 158184, at *1 (S.D. Ind. Sep. 27, 2017); *Dabney v. Taminco US, Inc.,* Case No. 3:15-cv-533/MCR/EMT (N.D. FL); *Maroz v. Arcelormittal Monessen, LLC,* No. 15-cv-00771-AJS (W.D. PA Nov. 14, 2016); *Fritz v. City of Ecorse*, Case No. 13-000371-NZ (Wayne County MI Circuit Ct.); *Ray v. City of Lansing*, Case No. 13-124242-NZ (Ingham County MI Circuit Ct.); *Laprarie v. City of Warren*, Case No. 11-0044560NZ (Macomb County MI Circuit Ct.); *Baynai v. City of Riverview,* Case No. 12-0072979 (Wayne County MI Circuit Ct.); *Domino v. City of Livonia*, Case No. 11-010285-NZ (Wayne County MI Circuit Ct.).

7.      In *McKnight v. Uber Techs., Inc.*, No. 14-cv-05615-JST, 2017 U.S. Dist. LEXIS 124534, at *23 (N.D. Cal. Aug. 7, 2017), I was appointed by the United States District Court for the Northern District of California to represent a nationwide class of millions of Uber passengers. That case resulted in a $32.5 million settlement.

8.      My law firm, Liddle & Dubin, P.C., has been devoted to representing individuals in class action litigation for more than 20 years. In addition to each of the cases list above, the firm has successfully represented certified plaintiff classes in such cases as:

*Alley et al v. Western Sugar Cooperative*, Case No. 2017CV30078 (Morgan Co. CO Dist. Ct.); *Hamilton et al v. 3D IdaPro Solutions, LLC*, Case No.: 3:18-cv-00054-jdp (W.D. Wisc.); *Keech et al v. Sanimax USA, LLC*, Case No 0:18-cv-00683-JRT-HB (D. Minn); *Buczynski v. Comprehensive Environmental Solutions*, Case No. 08-13559-AC-MKM (E.D. Mich); *Ward et al. v. U.S. Steel*, Case No. 04-74654-AC-DAS (E.D. Mich);

*Szcuzukowski v. LA Pac Corp*, Case No. 03-10007-DML (E.D. Mich); *Snow, et al v. Atofina Chem Inc,* Case No. 01-72648-VAR (E.D. Mich.); *Gardner, et al v. Lafarge Corp*., Case No. 99-10176-DML (E.D. Mich.); *Brindley v. Severstal*, Wayne County MI Circuit Court Case No. 07-704488-NZ; *Waldron v. Republic Services of Michigan*, Wayne County MI Circuit Court Case No. 06-615173-NZ; *Mauk v. Auto-Alliance*, Wayne County MI Circuit Court Case No. 06-603618-CZ; *Hawkins v. EQ Recovery Resources*, Wayne County MI Circuit Court Case No. 05-523503-NI; *Brush v. CWC Textron*, Muskegon County MI Circuit Court Case No. 04-42918-NZ; *Harker v. Sappi Paper Co*., Muskegon County MI Circuit Court Case No. 03-42512-NZ; *Beaushaw v. Monitor Sugar Co*., Bay City MI Circuit Court Case No. 03-3595-NZ; *Compora v. IKO Monroe, Inc*., Monroe County Circuit Court case no. 00-11245-NZ; *Dunlop v. Edward C. Levy Corp*., Wayne County MI Circuit Court Case No. 00-000629 NZ; *Pederson v. Sybill Inc*., Wayne County MI Circuit Court Case No. 99-940649-NZ; *Caines v. Marathon Oil*, Wayne County MI Circuit Court Case No. 99-940648 NZ; *Weiss v. Rouge Steel*, Wayne County MI Circuit Court Case No. 98-816224-NZ; *Howell v. Quaker Chemical Company*, Wayne County MI Circuit Court Case No. 97-731404 CZ; *Laprairie v City of Warren*, Macomb County MI Circuit Court Case No. 11-004456-NZ; *Svaluto v City of Westland*, Wayne County MI Circuit Court Case No. 10-009993-NZ; *Cash v City of Rockford*, Winnebago County WI Circuit Court Case No. 07-CH-1069; *Poszywak v. Township of Redford*, Wayne County MI Circuit Court Case No. 99-919177- NZ ; *Mashni v. Charter Township of Redford*, Wayne County MI Circuit Court Case No. 99-931967-NZ; *Vangoss v. Dearborn Heights*, Wayne County MI Circuit Court Case No. 98-805608-NZ; *Pohutski v. Allen Park*, Wayne County MI Circuit Court Case No. 98-813540-NZ; *Meister v. Garden City*, Wayne County

MI Circuit Court Case No. 98-806208-NZ; *Demeter v. Inkster*, Wayne County MI Circuit Court Case No. 98-808077-NZ; *Pierson v. City of Taylor*, Wayne County MI Circuit Court Case No. 98-811-867-NZ; *Kalajian v. Grosse Pointe Woods*, Wayne County MI Circuit Court Case No. 98-810033- NO; *Sickels v. Beverly Hills*, Oakland County MI Circuit Case No. 98-008-497-NZ; *Storgoff v. Township of Redford*, Wayne County MI Circuit Court Case No. 98-841445-NZ; *Grabowski v. City of Warren*, Macomb County MI Circuit Court Case No. 98-0825-NO; *Shadoian v. Birmingham*, Oakland County MI Circuit Court Case No. 98-008479- NZ; *Coddington v. Township of Harrison*, Macomb County MI Circuit Court Case No. 98-1096-NO; *Anliker v. Township of Harrison*, Macomb County MI Circuit Court Case No. 98-1097-NO; *Rizzo v. Detroit*, Wayne County MI Circuit Court Case No. 97-736853-NO; *Pressey v. City of Taylor*, Wayne County MI Circuit Court Case No. 98-813539-CZ; *Etheridge v. Grosse Pointe Park*, Wayne County MI Circuit Court Case No. 95-527-115-NZ.

9.      Liddle & Dubin, P.C. has successfully litigated appeals in class actions and obtained numerous favorable published decisions, including the following:

> *Baptiste v. Bethlehem Landfill Co.*, No. 19-1692, 2020 U.S. App. LEXIS 21559, at *1 (3d Cir. July 13, 2020) (reversal of dismissal of landfill environmental claims); *Clark-Floyd Landfill, LLC v. Gonzalez*, No. 19A-CT-2680, 2020 Ind. App. LEXIS 257, at *21 (Ct. App. June 18, 2020) (unanimously affirming grant of class certification on defendant's interlocutory appeal); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3d Cir. 2013) (circuit-wide issue of first impression holding that claims of plaintiffs and class were not preempted by federal statutory scheme, now adopted by several federal circuits and states); *Olden v. Lafarge Corp.*, 383 F.3d 495, 497 (6th Cir. 2004) (overruling prior

precedent that prohibited aggregating class damage for jurisdictional purposes and affirming district court's grant of class certification).

10.     In addition to myself, my firm employs five additional attorneys. Among these attorneys are partners Steven Liddle (who was named a Michigan Lawyer of the Year by Michigan Lawyers' Weekly in 2002, taught complex litigation as an adjunct professor at Michigan State University College of Law), David Dubin and Laura Sheets (who have each successfully represented plaintiffs in class action lawsuits for approximately 20 years), and associates Matthew Robb (a former law clerk at the United States Court of Appeals for the Sixth Circuit) and Albert Ascuitto (whose prior experience includes serving as the head of a complex litigation department at another law firm).

11.     My firm has conducted an extensive investigation into odor emissions from Defendant's landfill. Even prior to the initiation of this case, my firm requested, obtained and reviewed voluminous public records and administrative agency documents regarding complaints of odor from the landfill. My firm has also submitted questionnaires to residents throughout the class area to document their experiences related to odors they attribute to the facility and reviewed the responses thereto. This analysis informed us sufficiently of the salient strengths and weaknesses of the case. Beyond the investigation, drafting the complaint, engaging in extensive motion practice, and managing the litigation, we prepared for and conducted a full day of mediation with former Magistrate Judge William G. Bauer. At the mediation the parties reached agreement on some of the basic terms, including the monetary relief, and that agreement was recommended by Magistrate Judge Bauer. The mediation was the beginning of a negotiation process that lasted approximately four months before ultimately resulting in the Settlement Agreement. This allowed us to negotiate for improvements to the landfill that are expected to substantially reduce the potential for future odor emissions, offering the most important form of relief to Class Members.

12.     I believe that I and my firm possess the experience, knowledge, expertise, and resources to represent the Class in this case. If so appointed, we will continue to zealously represent the interests of the putative class.

13.     I believe that the Settlement Agreement represents an excellent result for the Class. While it is always possible that more would be recovered at trial, odor nuisance class actions face many significant hurdles in reaching trial, any one of which could be the death-knell of the case. Complex issues of causation and damages place the outcome of any trial in doubt, and the specter of appeal introduces even more risk. These cases are also extremely expensive to litigate. In prior landfill odor nuisance cases, my firm has advanced more than $200,000 (largely for costs related to scientific expert testimony) at the class certification stage alone. Such expenses can detract significantly from the Class' ultimate recovery. The certainty of immediate monetary and non-monetary relief is not worth risking, in my view, for the prospect of a better outcome which, if it arrives at all, would be many years down the road and reduced by substantial litigation expenses. All the while, the Class would be living with the odor problem. Because the Settlement Agreement does not release future claims, by the time a trial could be held in this case, another lawsuit could be filed should the improvement measures not be sufficient to fully remedy the problem.

14.     The cap on attorney fees, costs, and expenses in the Settlement Agreement was reached after all material relief had already been agreed upon.

15.     Attached as Exhibit A hereto is a true and correct copy of "The Impact of Landfills on Residential Property Values" from The Journal of Real Estate Research, by authors Alan K. Reichert, Michael Small, and Sunil Mohanty.

16.     Attached as Exhibit B hereto is a true and correct copy of the long-form mail notice that the parties have agreed upon.

17.     Attached as Exhibit C hereto is a true and correct copy of the short-form publication notice that the parties have agreed upon. It is proposed that this notice be published in the Rochester Democrat and Chronicle.

18.     Attached as Exhibit D hereto is a true and correct copy of the claim form that the parties have agreed upon.

19.     In administering the Settlement, my firm will establish a website, to which the notices will direct potential Class members, and which will include links to the Settlement Agreement, the long-form notice, the operative Complaint, and the Court's Preliminary Approval Order.

20.     In considering settlement, Mr. D'Amico was one of the most thoughtful and involved named Plaintiffs that I have ever worked with. He posed dozens of inquiries regarding the nature of the relief, the release, the attorneys' fees, the impact the settlement would have on related litigation, and the settlement's administration, among others, which advanced the cause of the Class. Due to Mr. D'Amico's willingness to serve his neighbors, they have been conferred significant benefits in the form of both monetary and non-monetary relief.

21.     At present, my firm has advanced approximately $10,000 in the prosecution of this litigation, and I expect that notice and administration will cost at least $10,000 more. Concurrently with the motion for final approval, we will submit a request for reimbursement delineating the expenditures.

22.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this July 14 of 2020 at Birmingham, Michigan.


Dated: July 14, 2020

                                        s/ Nicholas A. Coulson
                                        Nicholas A. Coulson

# Exhibit A

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/5142446

# The Impact of Landfills on Residential Property Values

**Article** *in* Journal of Real Estate Research · January 1992

Source: RePEc

CITATIONS
106

READS
2,583

**3 authors**, including:

Michael H. Small
East Tennessee State University

**34** PUBLICATIONS   **1,359** CITATIONS

SEE PROFILE

Sunil K. Mohanty
City University of New York - Brooklyn College

**44** PUBLICATIONS   **764** CITATIONS

SEE PROFILE

**Some of the authors of this publication are also working on these related projects:**

Project   research project View project

Project   Journal Publication on foreign banks View project

All content following this page was uploaded by Michael H. Small on 02 June 2014.

The user has requested enhancement of the downloaded file.

# The Impact of Landfills on Residential Property Values

*Alan K. Reichert**
*Michael Small**
*Sunil Mohanty**

**Abstract.** **The purpose of this study is to determine the impact of five municipal landfills on residential property values in a major metropolitan area (Cleveland, Ohio). The study concludes that landfills will likely have an adverse impact upon housing values when the landfill is located within several blocks of an expensive housing area. The negative impact is between 5.5%–7.3% of market value depending upon the actual distance from the landfill. For less expensive, older areas the landfill effect is considerably less pronounced, ranging from 3%–4% of market value, and essentially nonexistent for predominantly rural areas.**

## Introduction and Study Objectives

The purpose of this study is to determine the impact of municipal landfills on residential property values in a major metropolitan area (Cleveland, Ohio). It seems clear that homeowners have personal and financial incentives to protect their environment and the value of their real estate investment. Even industrial firms, which themselves generate a variety of waste, no longer view the environment as a convenient and inexpensive means of disposing of waste.

The scope of the waste disposal problem has grown enormously. In a recent study, Hanley [7] using EPA data, reports that 180 million tons of municipal solid waste was generated during 1988. This translates into 4.0 pounds of waste per person per day and this figure is expected to grow by 25% by the year 2010. The EPA estimates that 72.2% of the waste is disposed of in landfills compared to 14.2% that is burned, and 13.1% that is recycled. Hanley indicates that the total cost of operating a 100-acre landfill from acquisition through closure is approximately $50 million. Given these rising costs, over one-third of the nation's 6,000 landfills are expected to close by 1995. Other, less visible costs of landfills are the potential impact upon health and safety of local residents and the possible impact upon residential property values.

This study specifically examines: (1) the likely impact on market value of a decision to locate or expand a landfill near residential properties, (2) the price-distance relationship to estimate the marginal influence of proximity to a landfill, and (3) market's perception of the impact of landfills upon various quality-of-life and health factors, and (4) the effect of a landfill upon the rate of housing price appreciation and market liquidity.

A survey of homeowners living near landfills indicates that the most severe nuisances are odor and unattractiveness, while toxic water run-off and methane gas were mentioned

*Department of Finance, Cleveland State University, Cleveland, Ohio 44115.
Date Revised—November 12, 1991; Date Accepted—December 20, 1991.

as the most severe health issues. Not surprisingly, the farther from the landfill, the weaker the impact of the nuisance factors. The findings suggest that homeowners who own more expensive homes are more sensitive to landfill problems. Almost 30% of the respondents felt that the landfill had a severe adverse impact on selling price and marketability, while 17% felt the landfill could induce homeowner flight.

Data on housing sales indicates that landfills will most likely have an adverse impact upon housing values when the landfill is located within several blocks of an expensive housing area. The negative impact is between 5.5%–7.3% of market value depending upon the actual distance from the landfill. For less expensive, older areas the landfill effect is considerably less pronounced, ranging from minus 3%–4%, and essentially nonexistent for predominantly rural areas. The results of the current study should be useful to homeowners, real estate developers, mortgage lenders, fee appraisers, realtors, tax assessors, environmentalists, and public policy makers who frequently deal with zoning and other land use issues.

## Literature Review

While not intending to be an extensive review of the growing environmental impact literature this section summarizes a number of recent studies that specifically address the impact of various types of landfills on homeowner attitudes and housing values. There is a significant amount of empirical literature dealing with the impact on housing values of a variety of environmental issues such as air, noise, and water pollution (Harrison and MacDonald [8]; Harrison and Rubenfeld [9]; McMillan, Reid and Gillen [18]). At the theoretical level Freeman [5] surveys the issues relating to hedonic price models used to estimate the impact of environmental factors on housing prices.

In the area of waste disposal the famous Love Canal environmental disaster and the publicity surrounding the EPA's Superfund have focused a significant amount of attention upon the impact of hazardous waste sites on property values. For example, Adler et al. [1] examined the impact of hazardous waste sites on property values in two cities: Pleasant Plains, New York and Andover, Minnesota. The study provided limited support for a negative landfill effect in Pleasant Plains. In another study by Schulze et al. [25], housing markets near three California cities were examined for potential hazardous landfill effects. In only one region did houses within 1000 feet of the site report significant results.

Kohlhase [12] analyzed the impact of toxic waste sites in the Houston area on residential housing values and found that when EPA adds a site to the Superfund list a new market for "safe" housing develops. Housing prices reflect a premium of up to $3,310 per mile as distance to the site increases. Furthermore, these premiums disappear once the site has been cleaned up.

In an important study that has particular relevance to this study, McClelland, Schulze and Hurd [17] analyze the effect of risk perceptions on property values surrounding a hazardous waste site. The authors surveyed residents located near a large landfill located in the Los Angeles area. Opened in 1948, the landfill began accepting hazardous waste in 1976, stopped handling hazardous material in 1983, and finally closed a year later. Homes were built around the landfill and initial plans called for recreational facilities to eventually be built on the site.

While various experts and health officials determined that there was no significant health risk associated with the landfill, local residents were not totally convinced. The survey of resident attitudes revealed a bimodal distribution of risk perceptions. That is, a significant proportion simply dismissed the risk while others exaggerated its extent. The survey revealed that younger respondents and women generally perceived the landfill to be a greater risk. Furthermore, the study indicates that the residents interpreted odor from the landfill as a signal of potential health hazards.

Using an hedonic regression model, the study identified the impact of risk perceptions upon housing values and found that an increase of 10% in the proportion of respondents who felt the landfill represented a high risk reduced property values by $2,084. Furthermore, closing the landfill reduced the percentage of respondents classifying the landfill as high risk by 24%, which translated into a $5,000 gain in housing prices. These findings also suggest that housing prices would have been $9,795 or 7.2% higher if the landfill had never been built. The study also found that the positive impact of closure was reflected in improved property values within a few months. It was interesting to note that distance from the landfill did not prove to be a significant predictor. While distance was a significant factor in influencing risk perceptions, it was also found to be partially redundant with square footage and year built, and hence failed to make an independent contribution to selling price.

In another recent article, Cartee reviewed several unpublished studies that looked at the impact of sanitary landfills on property values [4]. The studies employed very different methodologies, data samples, and various degrees of analytical rigor. While the findings were not entirely consistent, the general conclusion appears to suggest that sanitary landfills do not have a large impact on real estate development activity and prices. In fact, in one case, the development of a sanitary landfill required a sufficiently large investment in infrastructure improvements, such as access roads, utilities, drainage, etc., that an increase in property values actually took place.

## Theory and Methodology

### Theory

The presence of a landfill can impact property values from both the supply and demand side. Even though land may be relatively inexpensive near a landfill, contractors may be hesitant to build and lenders may be reluctant to extend credit on properties located on or near landfills due to potential legal liabilities. On the demand side, buyers who are aware that a landfill exists in the area and who are concerned about potential nuisance and health problems will either avoid these properties or be induced to purchase them only at a significant discount. Whether the health problems are real or imaginary may not be the critical issue since people often act on the basis of perceptions, as well as fact. Furthermore, as summarized in the McClelland et al. article, there is a growing body of evidence to suggest that when faced with low probability risks, people generally tend to either ignore or exaggerate the risks involved [17].

As pointed out by McClelland, Schulze and Hurd, risk assessment by individual sellers may have little impact upon housing prices compared to the risk perceptions of the entire neighborhood. To illustrate, assume most residents in a given neighborhood

are generally unconcerned with the risk or nuisance associated with a landfill. While an individual seller may have a strong aversion to the landfill and be willing to sell at a sizeable discount, the homeowner may still be able to sell at the current market price and avoid a large loss. This is especially true if potential buyers are not fully aware of the landfill and its associated effects. For example, in the McClelland study, 62% of recent home buyers indicated that they were unaware of the landfill at time of purchase.

On the other hand, as the neighborhood becomes more concerned with the landfill, homes prices are likely to decline. To some extent the market experiences a self-fulfilling prophesy. If local residents exaggerate the negative aspects of a landfill and are anxious to leave the area at virtually any cost (i.e., neighborhood flight), the supply of housing offered for sale will be large. If buyers are fully informed about the landfill and its associated risks, they will either avoid the area altogether, reducing demand, or perhaps attempt to benefit from the problem by making substantially below-market offers. Any such decline in prices will be quickly reflected in the appraisal process by local realtors and professional appraisers. Sellers will be encouraged to price their homes even lower to remain competitive and a downward price spiral may develop.

Thus, the nature of the housing stock and attitudes of the local residents can make a significant difference. If the housing stock is generally inexpensive, of lower quality, and owned by residents who are older and perhaps less well educated, local homeowners may simply ignore any nuisance problems and potential future health hazards. If buyers with similar attitudes and risk profiles are attracted to the area, there may be little or no noticeable landfill impact. On the other hand, in areas where the population is younger and better educated, very concerned about health issues and child safety, and has a significant housing investment to protect, the potential adverse landfill impact could be significant.

In a well-known article Muth postulates that housing prices follow a definite spatial pattern, exhibiting a consistent decline as the distance from the central business district (CBD) increases [21]. The decline in value reflects increased commuting time and transportation costs required to reach the CBD and the greater availability of land at the urban fringe. The existence of these negative price gradients have been confirmed empirically by various researchers, such as Lie and Brown [14] and Jackson [10]. While the CBD represents a positive externality a similar argument can be made that a positive price gradient should be observed for housing located near a negative externality, such as a landfill. Instead of transportation costs affecting price, the negative effects of a landfill (e.g., odor, noise, toxic water, etc.) should decline as distance from the landfill increases.

Furthermore, many of the potential problems associated with a landfill relate to negative externalities such as odor, toxic water, and methane gas which are particularly troublesome when found in concentrated amounts. The volume of air and land surrounding the landfill should act to absorb at least some of these externalities and reduce their nuisance effect. Doubling the distance from a landfill increases the cubic volume of air surrounding the landfill by a factor of eight and increases the land area by a factor of four. Thus, the negative effect of a landfill could decline exponentially as distance increases.

### Methodology

The current study estimates the impact of municipal landfills on real estate prices using two different approaches: an event-study approach is used to estimate the

impact on a before-and-after comparison basis, and multiple regression techniques are employed to quantify the impact of proximity to the landfill. The study was conducted in two phases which involved both primary and secondary data analysis.

To obtain the views of knowledgeable homeowners regarding potential landfill effects, a questionnaire was distributed to 900 residents living near five sanitary landfills. The intent of the survey was not to make inferences that could be generalized to the entire population of homeowners but to identify the attitudes and concerns of homeowners having first-hand knowledge of potential landfill effects. The questionnaire requested information regarding the resident's proximity to the landfill and an assessment of any health or nuisance effects associated with the landfill. The survey also asked for information regarding the age, purchase price, and estimated market value of the respondent's home. In addition, the respondent was asked to provide his/her perception of the impact of the landfill in the immediate housing market.

To provide a suitable sample size, the survey data was aggregated across all five landfills. Approximately, 25% of the questionnaires were completed and returned. The reader should be alert to the fact that there may be some degree of non-response bias in the results since individuals who are unhappy about an issue are more likely to respond. Alternatively, some respondents may have chosen to purposely understate their true concerns as part of a continuing effort to minimize the market's perception of the problem. In this case these two sources of bias work to offset one another. In fact, the survey generated both neutral as well as negative views which indicates a balanced response. Furthermore, since the objective of the survey is more exploratory than inferential, the impact of any residual non-response or intentional bias is less crucial.

To substantiate the survey results, data on market prices and detailed housing characteristics for sales surrounding five landfills were obtained for the 1985–1989 period. Market transaction data on homes sold within one mile of the landfill were obtained. While a one-mile limit is somewhat arbitrary it was felt that given the heterogeneous and highly industrialized nature of Cuyahoga county, extending the study area beyond one mile would take in such a variety of extraneous factors as to make the accurate assessment of the potential impact of landfills extremely difficult, if not impossible.

The effects of a landfill are not expected to be uniformly circular since a host of factors, such as weather conditions (primarily wind direction), truck traffic, and the quality of landfill management, combine to determine the ultimate direction and extent of any potential landfill effect. Since reliable information regarding many of these factors was not available, the concentric circle approach was initially adopted and later discarded in favor of more localized impact areas. Parcel numbers were used to assign each housing transaction to a small geographic area, typically covering only several blocks. The distance from the center of each housing area to the center of the landfill was then measured.

To estimate a potential landfill effect, multiple regression models were estimated for each of the five landfills. As previously mentioned, many factors beside proximity to a landfill will effect housing prices. For example, differences in age, size, style, and date-of-sale will often have a significant impact upon selling prices. The use of multiple regression allows the researcher to account for many of these non-landfill factors. By including a number of important housing characteristics in the model in addition to the distance-from-landfill variable, one is able to separately measure the impact of the landfill alone, holding the effect of these other factors constant. To illustrate, let the following linear equation represent a multiple regression model to estimate housing prices.

$$P = b_o + b_1 X_1 + b_2 X_2 + \ldots + b_n X_n + b_m LF + e,$$

where,

$P$ = the sales price of the house;

$b_o$ = a constant term that summarizes the impact of variables not included in the model;

$b_1 \ldots b_n$ = the marginal value of certain housing characteristics, such as, size or age,

$b_m$ = the marginal impact of distance to the landfill measured in miles ($LF$);

$e$ = a random error term.

If the explanatory variables in the model are highly correlated (multicollinearity) the reported regression coefficients may be severely distorted. Variance inflation factors and condition indices recommended by Belsley, Kuh and Welsch [2] were used to test for multicollinearity which turned out not to be a major problem.[1]

To test whether or not the positive price gradient might be nonlinear, a log-linear version of the model was estimated. Since the results were quite comparable to the more straightforward linear model, the study reports only the linear multiple regression results. (See Kang and Reichert [11] for a more detailed discussion of optimal function form in appraisal models, and Reichert and Moore [23] for a more thorough discussion of multicollinearity.) Finally, only one of the five landfills began operations during the 1985–89 estimation period. The Jennings Road landfill was opened in March 1986 and thus allows one to make a before-and-after comparison.

## Study Sample and Data

Information on real estate transaction prices and detailed property characteristics for residential properties were provided by the Cuyahoga county (Cleveland area) auditor's and the assessor's office over the past fifteen years. Approximately 15,000 residential transactions take place each year. Ten landfills are registered in Cuyahoga county. Each of these facilities was visited to determine such characteristics as physical size, volume of activity, length of operation, and any unique management practices. Five study sites were selected based upon their proximity to residential areas. The annual processed waste tonnage at various landfills ranged from a low of 7,000 tons per year to a maximum of 46,500 tons per year. The number of sales within a one-mile radius of the landfills ranged from 110 to 963 over the five-year period. A brief description of the two landfills reported in this study are included in endnote.[2] (Statistical results for each of the remaining three landfills are available upon request.)

## Homeowner Survey Results

Homeowners living near the landfill were asked to evaluate potential health and nuisance problems on a scale of 1 to 5, where a rating of 1 indicates that the character-

## Exhibit 1
## Homeowner Evaluation of Landfill Impact

### Panel A—Potential Nuisance and Health Problems

|  |  | Not a Problem |  |  |  | A Major Problem | Mean Rating Value |
|---|---|---|---|---|---|---|---|
| Characteristic: |  | 1 | 2 | 3 | 4 | 5 |  |
| A. | Unattractive | 36.8 | 12.0 | 13.9 | 14.8 | 22.5 | 2.74 |
| B. | Odor | 39.3 | 10.7 | 10.2 | 14.1 | 25.7 | 2.76 |
| C. | Noise | 36.8 | 12.0 | 19.6 | 12.9 | 18.7 | 2.65 |
| D. | Truck traffic | 43.8 | 12.5 | 17.8 | 9.6 | 16.3 | 2.42 |
| E. | Blowing trash | 57.3 | 11.6 | 12.1 | 9.5 | 9.5 | 2.03 |
| F. | Health hazards: |  |  |  |  |  |  |
|  | (a) methane gas | 46.4 | 9.5 | 11.3 | 11.9 | 20.8 | 2.51 |
|  | (b) toxic water | 44.6 | 9.5 | 11.3 | 11.9 | 22.6 | 2.58 |
|  | (c) rodents | 44.9 | 12.4 | 13.5 | 11.8 | 17.4 | 2.44 |

### Panel B—Economic Impact on Housing Market

|  | No Impact |  |  |  | Large Negative Impact | Mean Rating Value |
|---|---|---|---|---|---|---|
| Characteristic: | 1 | 2 | 3 | 4 | 5 |  |
| Marketability | 38.0 | 151 | 18.0 | 14.1 | 14.6 | 2.52 |
| Homeowner flight | 50.0 | 18.8 | 14.4 | 9.4 | 7.4 | 2.05 |
| Selling price | 41.1 | 15.3 | 14.4 | 12.9 | 16.3 | 2.48 |

*Note*: Table values are percentages; mean ratings are absolute numbers.
*Source*: analysis of author's survey data

istic is not a concern, while a rating of 5 indicates that, in their opinion, the characteristic represents a major problem. Ratings in between indicate a problem of varying degree.

### Health and Nuisance Impacts

The results are reported in Panel A of Exhibit 1. To simplify the discussion, the two worst rating categories are combined to indicate when the factor is truly a significant problem. Among potential nuisances, odor appears to be the most significant problem as mentioned by 39.8% of the respondents, followed closely by unattractiveness (37.3%). Blowing trash and truck noise appears to be the least significant problems. In terms of potential health hazards, toxic water run-off was mentioned by 34.5% of the respondents, 32.7% mentioned methane gas, while 29.2% indicated that rodents were a significant problem.

To estimate the aggregate effect of these nuisances and health hazards, several indices were created. For a given respondent, numerical scores were summed over two subsets of problem characteristics. The Nuisance Index represents the aggregate score for the

**Exhibit 2**
**Relationship between Landfill Impact Indices and Housing Market Characteristics**

|  | Distance | | Estimated Price | | Rate of Appreciation | |
|---|---|---|---|---|---|---|
| Index: | Corr. | Prob. | Corr. | Prob. | Corr. | Prob. |
| Nuisance | −.11 | .069 | .23 | .00 | −.11 | .074 |
| Health | .05 | .233 | .33 | .00 | .04 | .300 |
| Total | −.06 | .198 | .28 | .00 | −.10 | .097 |

*Source:* analysis of author's survey data

following characteristics: unattractiveness, odor, noise, truck traffic, and blowing trash. Thus, for each respondent, the aggregate score can range from 0 to 25. In a similar fashion, a Health Hazard Index was computed which included methane gas, toxic water run-off, and rodents. The Health Hazard Index can assume values from 0 to 15. A Total Impact Index was then computed that included both the Nuisance and Health Hazard Indices, and can assume values between 0 and 45 (note: an ''Other'' problem category was also included in the Total Impact Index.)

Homeowners were also asked to estimate how close their property was to the nearest portion of the landfill as measured in feet. In addition, respondents were asked to estimate the current market value of their home and provide information regarding the purchase price, date of purchase, and the value of any major additions to their property. From this information it was possible to estimate the average annual rate of price appreciation adjusted for the value of major additions. Exhibit 2 summarizes the correlation between distance from the landfill, current market prices, and average annual appreciation rates with each of the three indices. Since one can infer a likely directional impact, the one-tail level of significance is reported.

The data indicates that the correlation between distance and the Nuisance Index is significant at the 10% level, providing limited support for the attitude gradient hypothesis (i.e., as distance from the landfill increases, homeowner attitudes improve as reflected in a decline in the value of the nuisance index). On the other hand, all three indices are highly significant and positively correlated with an estimate of current market price. This suggests that residents owning more expensive homes are apparently more sensitive to these nuisance and potential health factors.

One would also expect that proximity to a landfill might reduce the rate of price appreciation over an extended period of time. Once again the nuisance factor is negatively correlated with appreciation rates at the 10% level of significance. In general, the nuisance factors appear to have the most consistent impact. This may possibly be attributed to the fact that characteristics such as odor, unattractivenes, noise, etc. are more readily observable than health factors such as methane gas and toxic water.

As reported in Exhibit 1—Panel B, respondents were asked to evaluate the impact of the landfill upon the price and marketability of houses in their area. Marketability refers to how easy (or difficult) a house is to sell at a reasonable price. In extreme cases,

**Exhibit 3**
**Annual Appreciation Rate Grouped by Extent of Problem**

| Type of Market Impact | Major Problem | Not Major Problem | Rate Diff. | Stat. Sig. |
|---|---|---|---|---|
| Marketability | .054 | .070 | .016 | .01 |
| Homeowner Flight | .049 | .069 | .020 | .01 |
| Negative Price Impact | .058 | .069 | .011 | .04 |

*Source:* analysis of author's survey data

homeowners may be induced to sell to avoid the landfill when otherwise they would like to remain in the area (homeowner "flight"). Approximately 29% of the respondents felt that the landfill had a significant negative impact upon selling price, followed closely by 28.7% who felt that proximity to a landfill significantly reduced the marketability of their property. Just under 17% felt that the problem was severe enough to induce homeowner flight.

To test whether or not the market's perception had a statistically significant impact on appreciation rates, respondents were divided into two groups: those indicating that marketability, homeowner flight, and selling price are major problems (e.g., ratings 4 and 5) and those giving these factors a lower rating. A *t*-test on the mean difference in appreciation rates between the two groups was conducted. One-tail tests of significance are reported in Exhibit 3.

As expected, the estimated average annual appreciation rates for homeowners who indicated that the landfill has had a major impact upon the local housing market were consistently lower than for the remaining homeowners. For example, the average annual appreciation rate for homeowners indicating that the landfill had a major impact on marketability was only 5.4% compared to 7.0% for the others. This represents almost a 30% difference in appreciation rates when measured in relative terms and was statistically significant at the 1% level.

## Sales Price Analysis

The previous section dealt with homeowners perceptions of landfill problems and their potential impact upon the housing market. This section develops an hedonic regression model based upon actual housing prices (PRICE) and a detailed breakdown of housing characteristics. Appraisal theory indicates that basic major structural factors such as size, number of bedrooms and baths, and functional obsolescence as well as physical depreciation affect housing values. In models such as hedonic price equations which assume efficient housing markets, prices should reflect the marginal utility of key housing characteristics. While housing preferences change over time, most homeowners (within reason) prefer homes with more living space, larger lots, and value the privacy afforded by more bedrooms and baths. Thus, space, privacy, convenience, as well as various housing amenities such as air conditioning and the presence of a fireplace belong

in the average housing utility function, and hence should be included as explanatory variables in an hedonic price model.

While utility theory is not sufficiently well developed to identify the precise definition of all the variables, a wide range of statistical studies have documented the importance of a consistent set of housing characteristics effectively employed in hedonic appraisal models (Gloudemans and Miller [6]; Wood [26]; Lang and Jones [13]; Bryan and Colwell [3]; Mark [15]; Morton [20]; Kang and Reichert [11]; Kohlhase [12]). The variables included in the current model are drawn from the recent empirical literature and generally conform to current appraisal practice. The set of regressors include the following continuous variables: total square footage of living area (*SQFEET*), square footage of garage space (*GARGE*), square footage of the lot (*LOT*), age of the house in years (*AGE*), total number of baths (*BTHS*), and distance from the landfill measured in miles (*DIST*). Since the sample includes housing transactions recorded over a five-year period it is necessary to adjust the results for inflation. To make this adjustment, a time variable (*TIME*) was included whose value runs from 1 to 60, reflecting the sixty months between January 1985 and December 1989. The regression coefficient on the *TIME* variable represents an average rate of monthly appreciation over the sample period (see Mark and Goldberg [16] for a discussion of alternative time indices).

In addition, a number of housing amenities are included as dummy variables in the model. Their presence is indicated with a 1 and a 0 for their absence. These variables include central air conditioning (*AIR*), full-basement (*BSMT*), above-average construction quality (*QUAL*), fireplace (*FIREPL*), and housing style (*RANCH, SPLIT* for split or bi-level, *BUNG* for bungalow; the base style is *COLONIAL*).

### Aggregate Model

A pooled cross-sectional model was initially estimated across all five landfills over a five-year period. A dummy variable was used to account for differences associated with each unique landfill (results not reported). Most of the variables were statistically significant, carried the expected sign, and appeared to be of reasonable size. The one surprise was the *DIST* variable where the coefficient was estimated to be −$12,850. This indicates that housing prices decline by $12,850 for each mile one travels away from the landfill. This result is opposite what one would anticipate assuming a significant negative landfill effect. One problem that may be affecting the results is the fact that the nature of the housing market can change dramatically over relatively short distances. For example, a comparison of mean housing values indicates that there is a decline of about $7,000 in the average selling price as one moves one mile out from the landfill.

Estimating a pooled model across all five landfills introduces an unnecessary degree of cross-sectional variation into the sample. For example, Michaels and Smith [19] found that disaggregating a sample into four distinct submarkets characterized as ranging from below average to premier in terms of housing and neighborhood quality, significantly improved the reliability of the estimated results. The authors used the Tiao-Goldberg statistic to test for equality of the regression results among the four models. Virtually all of the explanatory variables reported unique housing prices effects across the four submarkets. Motivated by the improved submarket results reported by Michael and Smith, separate hedonic models were estimated for each landfill in the current study.

Only the results from the two landfills that generated statistically significant findings are discussed below. The results from the other three landfills are integrated into the conclusion section.

### Jennings Road Landfill

The Jennings Road landfill began operation during March 1986. As suggested by Michaels and Smith, it is possible that the commencement of landfill operations may have a delayed impact upon housing prices. To test for this possibility a dummy variable (*AFTERONE*) was included that identifies sales that took place at least one year after the commencement of operations. Exhibit 4 reports the regression results for the Jennings Road landfill.

The model produced an *R*-square of 50.5%, an *F*-value of 64.4, and ten statistically significant variables with the expected sign and of reasonable size (*BSMT, QUAL, FIREPL, GARGE, SQFEET, LOT, AGE DIST, TIME, AFTERONE*). For example, the coefficient on basement (*BSMT*) is $8,604, the hedonic price for a fireplace (*FIREPL*) is $5,231, and the estimated annual rate of depreciation is −$284. The distance-from-the-landfill variable (*DIST*) once again carried a statistically significant negative coefficient of −$8,813. On the other hand, as expected, the coefficient on the dummy variable that divides the time period (*AFTERONE*) carried a negative and statistically significant coefficient of −$2,924. This value represents 6.1% of the average housing price in the area. The negative coefficient on *DIST* can possibly be explained by the fact that average housing values decline by about $14,000 as one moves out one mile from the landfill ($55,713 vs. $41,702).

### Westlake Landfill

Exhibit 5 reports the results of the regression for the Westlake landfill. The model produced an *R*-square of 69%, an *F*-value of 89.2, and seven significant variables (*AIR, BSMT, SQFEET, TIME, BTHS, RANCH,* and *BUNG*). The coefficient on *DIST* while negative (−$971) was not statistically significant.

Taken together these results are somewhat disappointing. Neither approach to modelling the impact of distance to the landfill produced logical and consistent results. In only one case, the Jennings Road facility, was a significant negative landfill effect observed, and this related more to the beginning of operations rather than distance. A circle with a radius of one mile has an area of approximately 3.14 square miles. This can encompass a wide range of topographies, demographics, and housing structures. As previously mentioned, the area surrounding each landfill is unique. For example, the north rim of the study area for Westlake touches Lake Erie, while the east rim of the study area for the Jennings Road landfill is primarily an industrial parkway. In fact, for several of the landfills the housing closest to the landfill is the most homogeneous. As one moves out from these landfills the variety of housing increases and in many cases substantial declines in quality and value are noted. The housing characteristic variables in the model should adjust for some of these differences but perhaps not all of them.

**Exhibit 4**
**Jennings Landfill Regression Results: *DIST* Variables**

Stepwise Regression to Predict: PRICE

| Variable | Variable List—Descriptive Statistics | |
|---|---|---|
| | Mean | Std. Dev. |
| PRICE | 48265.64 | 13459.00 |
| AIR | .01 | .13 |
| BSMT | .95 | .19 |
| QUAL | .03 | .19 |
| FIREPL | .15 | .35 |
| GARGE | 349.26 | 170.29 |
| SQFEET | 1323.18 | 382.92 |
| LOT | 5944.58 | 3172.76 |
| AGE | 52.79 | 20.20 |
| DIST | .62 | .20 |
| TIME | 31.72 | 16.87 |
| BTHS | 1.27 | .45 |
| RANCH | .15 | .36 |
| SPLIT | .03 | .17 |
| BUNG | .30 | .46 |
| AFTERONE | .59 | .49 |

Regression Statistics

| | |
|---|---|
| Coefficient of multiple determination | = .505 |
| Coefficient of multiple correlation | = .710 |
| Standard error of multiple estimate | = 9543.42 |
| F-Ratio | = 64.4228 |
| Degrees of freedom | = 15 & 947 |
| Probability of chance | = .0000 |
| Number of valid cases | = 963 |
| Number of missing cases | = 2 |
| Response percent | = 99.79% |

| Var. | Coeff. | Regression Coefficients | | Prob. | Std. Error |
|---|---|---|---|---|---|
| | | Beta | F-ratio | | |
| AIR | 1046.70 | .0108 | .20 | .647 | 2285.50 |
| BSMT | 8604.37 | .1261 | 19.45 | .000 | 1950.98 |
| QUAL | 12005.19 | .1715 | 50.41 | .000 | 1690.74 |
| FIREPL | 5230.88 | .1391 | 33.10 | .000 | 909.17 |
| GARGE | 9.45 | .1196 | 24.26 | .000 | 1.91 |
| SQFEET | 9.00 | .2563 | 59.91 | .000 | 1.16 |
| LOT | .55 | .1309 | 26.98 | .000 | .10 |
| AGE | − 283.97 | − .4262 | 172.24 | .000 | 21.63 |
| DIST | − 8812.62 | − .1330 | 29.38 | .000 | 1625.77 |
| TIME | 279.91 | .3509 | 64.15 | .000 | 34.94 |
| BTHS | 1211.39 | .0413 | 2.16 | .141 | 822.54 |
| RANCH | − 486.85 | − .0132 | .14 | .705 | 1287.02 |
| SPLIT | 2451.25 | .0317 | 1.03 | .039 | 2409.07 |
| BUNG | − 355.94 | − .0122 | .20 | .650 | 785.50 |
| AFTERONE | − 2923.80 | − .1067 | 5.93 | .015 | 1200.21 |
| Const. | 32104.89 | | 174.57 | .000 | 2429.82 |

*Source*: analysis of author's survey data

## Exhibit 5
## Westlake Landfill Regression Results: *DIST* Variables

Stepwise Regression to Predict: PRICE

| Variable | Variable List—Descriptive Statistics | |
| --- | --- | --- |
| | Mean | Std. Dev. |
| PRICE | 112112.34 | 50087.05 |
| AIR | .37 | .48 |
| BSMT | .84 | .35 |
| QUAL | .66 | .47 |
| FIREPL | .63 | .48 |
| GARGE | 437.62 | 124.05 |
| SQFEET | 1921.45 | 685.65 |
| LOT | 15594.03 | 9795.24 |
| AGE | 28.55 | 17.05 |
| DIST | .70 | .20 |
| TIME | 27.75 | 16.62 |
| BTHS | 2.17 | .87 |
| RANCH | .29 | .45 |
| SPLIT | .07 | .26 |
| BUNG | .22 | .42 |

Regression Statistics

Coefficient of multiple determination  = .691
Coefficient of multiple correlation    = .831
Standard error of multiple estimate    = 28187.20

F-Ratio                = 89.1504
Degrees of freedom     = 15 & 558
Probability of chance  = .0000

Number of valid cases   = 573
Number of missing cases = 15
Response percent        = 97.45%

| Var. | Coeff. | Regression Coefficients | | | |
| --- | --- | --- | --- | --- | --- |
| | | Beta | F-ratio | Prob. | Std. Error |
| AIR | 5880.04 | .0569 | 3.68 | .055 | 3064.62 |
| BSMT | 15017.31 | .1072 | 16.63 | .000 | 3681.65 |
| QUAL | − 2827.74 | − .0266 | .55 | .457 | 3801.95 |
| FIREPL | − 1602.78 | − .0154 | .29 | .598 | 2967.19 |
| GARGE | 19.88 | .0492 | 2.53 | .111 | 12.47 |
| SQFEET | 44.59 | .6015 | 206.40 | .000 | 3.10 |
| LOT | .03 | .0077 | .07 | .777 | .13 |
| AGE | − 64.03 | − .0218 | .43 | .510 | 97.25 |
| DIST | − 970.73 | − .0040 | .02 | .877 | 6301.63 |
| TIME | 658.75 | .2186 | 84.28 | .000 | 71.75 |
| BTHS | 8738.74 | .1526 | 10.99 | .001 | 2635.50 |
| RANCH | 6356.11 | .0578 | 2.87 | .090 | 3749.55 |
| SPLIT | − 6144.09 | − .0330 | 1.57 | .210 | 4898.20 |
| BUNG | − 8304.70 | − .0697 | 5.23 | .022 | 3631.31 |
| Const. | − 29193.64 | | 13.14 | .000 | 8053.60 |

*Source*: analysis of author's survey data

In an effort to define a more homogeneous Westlake sample, a smaller region just north of the landfill was selected. Here the landfill is separated from an expensive residential community (Bay Village) by an active set of railroad tracks. Thus, houses located directly north of the landfill are subject to both a potential landfill and a railroad effect. A dummy variable was included in the model to measure the combined impact of the landfill and the railroad (*LF&RR*). To help separate the two effects, it was noted that houses located near the far northwest and northeast corners of the landfill and adjacent to the railroad tract are primarily subject to a railroad effect. A second dummy variable (*RR*) was included to measure this "pure" railroad effect. One would expect the absolute value of the coefficient on *LF&RR* to exceed the coefficient on *RR*. In fact, the difference between the two coefficients (*LF&RR–RR*) would represent the landfill effect.

As indicated in Exhibit 6, approximately 19.2% of the 375 housing transactions in the reduced model are subject to both the railroad and landfill effects, while 22.4% of the housing sales fall in the pure railroad effect areas. Reflecting a more homogeneous market area, the model's $R$-square increased to almost 80%. Eight variables are statistically significant and carry the expected sign (*AIR, BSMT, SQFEET, AGE, TIME, BUNG, LF&RR*, and *RR*). Both the *LF&RR* and *RR* variables are negative and, as anticipated, the absolute value of the coefficient on *LF&RR* exceeds the coefficient on *RR* ($12,787 vs. $6,722). This difference of $6,065 can reasonably be attributed to the landfill. This represents a decline of 5.5% compared to the average selling price of $108,786, which is generally consistent with the −6.1% impact reported in the Jennings Road landfill results.

## Conclusions

The survey of homeowners living near landfills indicates that the most severe nuisances are odor and unattractiveness which were reported by about 40% of the respondents. Toxic water run-off and methane gas were mentioned by approximately 35% of the respondents as the most severe health issues. Not surprisingly, the farther from the landfill, the weaker the impact of the nuisance factors. A strong correlation was found between the respondent's estimated market price and both nuisance and health indices. This suggests that homeowners who own more expensive homes are more sensitive to landfill problems. Furthermore, the nuisance factors appear to have a weak negative impact upon estimated appreciation rates. Almost 30% of the respondents felt that the landfill had a severe adverse impact on selling price and marketability, while 17% felt the landfill could induce homeowner flight. Both nuisance and potential health problems are perceived to be related to a reduced level of marketability, lower selling prices, and increased homeowner flight. Furthermore, lower average annual appreciation rates are associated with reduced marketability, lower selling prices, and homeowner flight.

A total of 2243 market sales located near the five landfills were analyzed. The results are somewhat mixed as the current literature suggests. For example, the negative coefficient (−$2,924) associated with the dummy variable that marks the one-year anniversary of the opening of the Jennings Road landfill, suggests that the facility may have reduced property values by an average of 6.1%. On the other hand, when a circular area of about three square miles is used as the study region and proximity to the landfill

## Exhibit 6
## Westlake Landfill Regression Results: *LF&RR* Variables

Stepwise Regression to Predict: PRICE

| Variable | Variable List—Descriptive Statistics | |
|---|---|---|
| | Mean | Std. Dev. |
| PRICE | 108786.53 | 46220.68 |
| AIR | .33 | .47 |
| BSMT | .83 | .36 |
| QUAL | .69 | .46 |
| FIREPL | .62 | .48 |
| GARGE | 429.42 | 121.24 |
| SQFEET | 1869.80 | 654.98 |
| LOT | 14012.94 | 5715.68 |
| AGE | 27.47 | 12.77 |
| TIME | 28.67 | 17.14 |
| BTHS | 2.19 | .87 |
| RANCH | .30 | .46 |
| SPLIT | .06 | .25 |
| BUNG | .24 | .43 |
| LF&RR | .19 | .39 |
| RR | .22 | .41 |

Regression Statistics

Coefficient of multiple determination = .795
Coefficient of multiple correlation = .891
Standard error of multiple estimate = 21360.24

$F$-Ratio = 92.8123
Degrees of freedom = 15 & 359
Probability of chance = .0000

Number of valid cases = 375
Number of missing cases = 1
Response percent = 99.73%

| Var. | Coeff. | Regression Coefficients | | | |
|---|---|---|---|---|---|
| | | Beta | F-ratio | Prob. | Std. Error |
| AIR | 7743.58 | .0792 | 7.79 | .005 | 2772.68 |
| BSMT | 11296.02 | .0903 | 10.14 | .001 | 3546.87 |
| QUAL | −4052.00 | −.0406 | 1.14 | .284 | 3780.12 |
| FIREPL | 2610.62 | .0274 | .83 | .360 | 2848.89 |
| GARGE | 17.47 | .0458 | 1.88 | .170 | 12.73 |
| SQFEET | 46.51 | 6591 | 206.97 | .000 | 3.23 |
| LOT | −.14 | −.0174 | .33 | .565 | .24 |
| AGE | −455.53 | −.1259 | 11.95 | .000 | 131.75 |
| TIME | 708.07 | .2626 | 112.10 | .000 | 66.87 |
| BTHS | 3235.97 | .0612 | 1.47 | .224 | 2661.14 |
| RANCH | 2793.98 | .0279 | .58 | .445 | 3659.47 |
| SPLIT | −5597.05 | −.0308 | 1.24 | .266 | 5023.96 |
| BUNG | −8843.43 | −.0827 | 5.88 | .015 | 3646.76 |
| LF&RR | −12787.89 | −.1091 | 13.33 | .000 | 3501.49 |
| RR | −6722.11 | −.0607 | 3.98 | .046 | 3366.70 |
| Const. | −3808.51 | | .31 | .573 | 6751.68 |

*Source*: analysis of author's survey data

is measured in miles, counter-intuitive results are obtained in four of the five regions. That is, as distance from the landfill increases market values decline, or alternatively, the closer to the landfill the greater the average market value.

At first glance these results might suggest a positive landfill effect but only a few of the survey respondents specifically identified positive aspects of living near a landfill. Furthermore, the size and quality of housing and the nature of the terrain can change dramatically within a relatively short distance. These factors can have a significant impact upon housing prices. While appraisal theory can identify a sizeable number of key housing price determinants such as those included in the current models, data limitations may make it impossible to model all possible factors.

In an effort to reduce the heterogeneous nature of the housing market, two landfills were selected for more careful study. The study areas were reduced to a more a homogeneous region immediately surrounding the landfill. In only the Westlake landfill was a negative and statistically significant result observed. Limiting the analysis to a 15–18 block area running parallel to the landfill suggests an average $6,000 negative landfill effect. For housing within sight of the landfill the average negative landfill impact increases to approximately $8,000. These findings suggest a 5.5% to 7.3% impact upon average housing values and are generally consistent with the McClelland, Schulze and Hurd results where property values in an equally expensive housing market were approximately 7.2% lower due to a hazardous waste landfill. Since none of the landfills in the current study accept hazardous waste, it seems logical that the McClelland, Schulze and Hurd findings would be towards the upper end of the impact range for sanitary (nonhazardous) waste sites. In the Jennings Road and Brooklyn landfills a weaker negative impact of between 3%–4% was observed.

It is perhaps not surprising that the strongest negative impact was observed in the Westlake area that has by far the most expensive housing located immediately north of the landfill. This southern edge of Bay Village is a quite homogeneous, high income area with large, relatively new homes owned by a mix of young and middle-age families. For several of the other landfills, the surrounding housing stock is generally smaller, less expensive, and often owned by older residents near retirement age.

Thus, this study concludes that landfills will likely have an adverse impact upon housing values when the landfill is located within several blocks of an expensive housing area. The negative impact is between 5.5%–7.3% of market value depending upon the actual distance from the landfill. For less expensive, older areas the landfill effect is considerably less pronounced, ranging from 3%–4%, and essentially nonexistent for predominantly rural areas.

## Notes

[1]Two measures of multicollinearity were calculated; variance inflation factors (VIFs) for each independent variable and condition indices suggested by Belsley, Kuh and Welsch. The largest VIF for the Jennings landfill model was only 2.4 and the largest value for the Westlake landfill model was 4.5. In neither case did the condition indices exceed a value of 30 with at least two variance proportions in excess of 0.5.

[2]The Jennings Road landfill processes only construction materials, such as lumber and bricks. The site is surrounded on three sides by homes of various types that generally fall in the low to

moderate price range, while to the east lies an industrial parkway. The area northeast of the landfill is highly industrialized with a large manufacturing plant dominating the region. The Jennings landfill facility was opened in 1986 and appears to process a relatively low volume of trash. According to local residents, prior to commencement of operations the present site of the landfill was an unregulated open area that was frequently used as an illegal dumping area and for unsupervised recreational activity. The one-mile study area included 963 sales during the five-year estimation period.

The Westlake landfill is located in the northern part of the city of Westlake along the Bay Village border. An active Norfolk & Western railroad track runs along the north side of the landfill. Expensive residential properties exist along the Bay Village side, while less expensive homes surround the landfill on the remaining three sides. South of the landfill is a significant commercial park development, while to the east and southeast of the landfill are apartments, condominiums, retirement facilities, and a few single-family homes. The landfill commenced operations in 1958 and closed in May 1990. Most of the expensive residential development just north of the landfill in Bay Village took place after the landfill began operations. A section of the landfill that has been closed for several years has been landscaped and is being used for recreation purposes. One portion of the landfill is now being used for a leaf composting project. When the landfill was active it processed waste from the city of Westlake only. The landfill was closed after significant public protests arose regarding potential environmental and health hazards from local residents and a perceived negative impact upon home values from residents in Bay Village. The one-mile study area included 586 sales during the five-year estimation period.

# References

[1] K. Adler, R. Anderson, Z. Cook, R. Dover, A. Ferguson and M. Vickers. The Benefits of Regulating Hazardous Waste Disposal: Land Value as an Estimator. Washington, DC: Public Interest Economics Center, 1982.

[2] D. Belsley, E. Kuh and R. Welsch. *Regression Diagnostics*. New York: John Wiley, 1980.

[3] T. Bryan and P. Colwell. Housing Price Indexes. In *Research in Real Estate*, Vol. 2. Greenwich, CT: JAI Press, Inc., 1982.

[4] C. Cartee. A Review of Sanitary Landfill Impacts on Property Values. *Real Estate Appraiser & Analyst* (Spring 1989), 43–47.

[5] A. Freeman. Hedonic Prices, Property Values and Measuring Environmental Benefits: A Survey of the Issues. *Scandinavian Journal of Economics* (1979), 154–73.

[6] R. Gloudemans and D. Miller. Multiple Regression Analysis Applied to Residential Properties: A Study of Structural Relationships over Time. *Decisions Sciences* 7:2 (April 1976), 294–304.

[7] R. Hanley. Mid-American Waste Systems, Inc. Basic Report, McDonald & Company, January 1991.

[8] D. Harrison and R. MacDonald. Willingness to Pay in Boston and Los Angeles for a Reduction in Automobile-related Pollutants. Washington DC: National Academy of Sciences, 1974.

[9] D. Harrison and D. Rubenfeld. Hedonic Housing Prices and the Demand for Clean Air. *Journal of Environmental Economics and Management* 5 (1978), 81–102.

[10] J. Jackson. Intraurban Variation and the Price of Housing. *Journal of Urban Economics* (October 1979), 464–70.

[11] H. Kang and A. Reichert. An Evaluation of Alternative Estimation Techniques and Functional Forms in Developing Statistical Appraisal Models. *Journal of Real Estate Research* 2:1 (Fall 1987), 1–29.

[12] J. Kohlhase. The Impact of Toxic Waste Sites on Housing Values. *Journal of Urban Economics* 30 (July 1991), 1–26.

[13] J. Lang and W. Jones. Hedonic Property Valuation Methods: Are Subjective Measures of Neighborhood Amenities Needed? *AREUEA Journal* 7 (1979), 451–64.

[14] M. Lie and J. Brown. Micro-Neighborhood Externalities and Hedonic Housing Prices. *Land Economics* 56 (May 1980), 126–41.

[15] J. Mark. An Empirical Examination of the Stability of Housing Price Equations Over Time. *AREUEA Journal* 11:3 (Fall 1983), 397–415.

[16] ——— and M. Goldberg. Alternative Housing Price Indices: An Evaluation. *AREUEA Journal* 12:1 (1984), 30–49.

[17] G. McClelland, W. Schulze and B. Hurd. The Effect of Risk Beliefs on Property Values: A Case Study of a Hazardous Waste Site. *Risk Analysis* 10:4 (1990), 485–97.

[18] M. McMillan, B. Reid and D. Gillen. An Extension of the Hedonic Approach for Estimating the Value of Quiet. *Land Economics* (August 1980), 315–28.[20]

[19] R. Michaels and V. Smith. Market Segmentation and Valuing Amenities with Hedonic Models: The Case of Hazardous Waste Sites. *Journal of Urban Economics* 28 (1990), 223–42.

[20] T. Morton. Factor Analysis, Multicollinearity and Regression Appraisal Models. *Appraisal Journal* (October 1977), 578–88.

[21] R. Muth. *Cities and Housing*. Chicago: University of Chicago Press, 1969.

[22] J. Nelson. Residential Choice, Hedonic Prices, and the Demand for Urban Air Quality. *Journal of Urban Economics* (1978), 357–69.

[23] A. Reichert and J. Moore. Analyzing the Nature of Multicollinearity in Real Estate Models. *Real Estate Appraiser and Analyst Journal* (Fall 1986), 34–39.

[24] W. Schulze, G. McClelland and D. Coursey. Valuing Risk: A Comparison of Expected Utility with Models from Cognitive Psychology. University of Colorado, Laboratory for Economics and Psychology, 1986.

[25] W. Schulze, G. McClelland, B. Hurd and J. Smith. Improving Accuracy and Reducing Costs of Environmental Benefit Assessments. In Vol. IV, *A Case Study of a Hazardous Waste Site: Perspectives from Economics and Psychology*. Washington, DC: U.S. Environmental Protection Agency, 1986.

[26] S. Wood. Combining Forecasts to Predict Property Values for Single-Family Residences. *Land Economics* 52 (May 1976), 221–29.

*The authors are grateful for the financial support provided by the Ohio Real Estate Education and Research Fund and the Center for Real Estate Research Education and Research at The Ohio State University.*

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

# NOTICE OF PENDENCY OF CLASS ACTION SETTLEMENT

**If you owned and occupied, or rented residential property located within approximately 2.5 miles of the High Acres Landfill at any time since January 26, 2015, you may be a Settlement Class Member.**

## *<u>Please read this Notice carefully, as it affects your legal rights.</u>*

(A federal Court authorized this notice.  This is <u>not</u> a solicitation from a lawyer.)

- A proposed settlement has been reached with the owner and operator of the High Acres Landfill ("Defendant") to resolve claims brought by Named Plaintiff on behalf of a proposed class relating to the alleged emission of pollutants, air contaminants, and noxious odors ("emissions") from the landfill. The proposed settlement has been memorialized in a written agreement between the parties (the "Settlement Agreement").
- If approved by the Court, the Settlement Agreement requires the Settlement Class Members to release the claims concerning the emissions and it requires Defendants to pay $1,300,000 into a fund (the "Settlement Fund") for the benefit and advantage of the Settlement Class Members, meaning all who participate in are and bound by the proposed settlement, as further defined by the Settlement Agreement. The Settlement Agreement also requires Defendants to spend $1,000,000 within 30 months on various improvement measures to help minimize the impact of airborne emissions from the landfill.
- This Class Notice explains the proposed settlement, your rights, the available benefits, and how to get them. As a potential Settlement Class Member you have various options that you may exercise before the Court decides whether to approve the proposed settlement. Unless you properly exclude yourself and opt out of the proposed settlement, you will be bound by its terms if it is approved by the Court.
- The Court in charge of this case still has to decide whether to approve the proposed settlement.
- Your legal rights are affected whether you act or do not act.  Please read this Notice carefully.

| Your Legal Rights and Options in this Proposed Settlement | |
|---|---|
| **MAKE A CLAIM FOR PAYMENT** | If you want to participate in the proposed settlement and receive a payment from the Settlement Fund, you must complete the attached Claim Form and submit it with the required information to Class Counsel no later than _____.  If you do not do so, you will waive your right to any payment from the Settlement Fund.  Whether you timely submit a properly completed Claim Form or not, if the Court approves the settlement, you will be part of the Settlement Class and be bound by the terms of the Settlement Agreement, including releasing Defendant from all claims as defined in the Settlement Agreement**.** After the deduction of expenses, costs, attorneys' fees for Class Counsel and incentive awards for Named Plaintiffs, all Settlement Class Member Households that submit approved Claim Forms will receive a check for an equal prorated share of the Settlement Fund, except that the share for a particular home may be divided if subject to multiple claims.  All checks must be cashed within 120 days of the date on the check or you will forfeit your right to receive any payment from the Settlement Fund. |
| **EXCLUDE YOURSELF OR "OPT OUT"** | If you exclude yourself and opt out of the proposed settlement, you will **no longer** be a Settlement Class Member, Class Counsel will not be representing you, your claims will not be released, and you will retain your right to sue Defendant about the same claims in this lawsuit. You will not be eligible to receive any payment from the proposed Settlement Fund, and you will have no standing or ability to object to the proposed settlement. To exclude yourself and opt out of the proposed settlement, you must strictly follow the procedures outlined below and submit your request no later than _____ or you will remain part of the Settlement Class and bound by the orders of the Court. |

Page 1 of 4

| | |
|---|---|
| **OBJECT** | If there is something about the proposed settlement that you do not like and think is legally inappropriate, you may remain part of the Settlement Class and object to all or part of the proposed settlement. You may do so on your own or through a lawyer that you hire to assist you. If you object, you will be part of the Settlement Class and still must submit a timely and properly completed Claim Form to receive payment under this settlement. To object to the proposed settlement, you must strictly follow the procedures outlined below and submit your written objection no later than _____ or you will waive your right to object. If you do properly and timely object, you will be part of the Settlement Class and bound by the Court's decisions like every other Settlement Class Member who does not opt out or exclude themselves. |
| **DO NOTHING** | You do not have to do anything to participate in the proposed settlement. But, if you do not do anything and the Court ultimately approves the proposed settlement, you will waive your right to object to any portion of the proposed settlement, you will be bound by the terms of the Settlement Agreement, and will have released Defendants from any and all claims as defined in the Settlement Agreement. You will not obtain any payment from the Settlement Fund, but you still will benefit from the other measures that Defendants will take as part of the proposed settlement to control the emissions. |

1. **WHAT IS THIS NOTICE ABOUT?** This Class Notice is to inform you of the proposed settlement of a class action lawsuit against Defendant Waste Management of New York, LLC, the owner and operator of the High Acres Landfill, pending in the United States District Court for the Western District of New York before the Honorable Elizabeth A. Wolford, United States District Judge. It summarizes your rights as set forth in the Settlement Agreement.

2. **WHAT IS THE LAWSUIT ABOUT?** The lawsuit (*D'Amico v. Waste Management of New York, LLC*, Western District of New York Case No: 6:18-cv-06080-EAW) was filed on January 26, 2018, and concerns the alleged airborne emission of pollutants, air contaminants, and noxious odors from the High Acres Landfill. The lawsuit alleges that at least certain odor emissions in the area surrounding the landfill occurred because of Defendants' conduct. The Named Plaintiff who filed the lawsuit alleges that these emissions have interfered with his ability to use and enjoy his home. Defendant has vigorously denied and continues to deny all claims of wrongdoing or liability arising out of the allegations and claims asserted in the lawsuit. Among other things, Defendant maintains that emissions are part of the ordinary operation of a landfill, and point to several other causes of emissions in the surrounding area.

3. **WHY IS THE CLASS ACTION BEING SETTLED?** The Court did not decide in favor of Plaintiff or the Defendant. Instead, all sides agreed to settle the claims asserted in the lawsuit to avoid the cost and risk of trial. The proposed settlement does not mean that any law was broken or that the Defendant did anything wrong. The Defendant denies all legal claims in this case. The Named Plaintiff and his attorneys, the Class Counsel, believe that the proposed settlement is in the best interest of all Settlement Class Members.

4. **HOW DO I KNOW IF I'M PART OF THE PROPOSED SETTLEMENT?** The Court has decided that the Settlement Class will include all owner/occupants and renters of residential property within the Class Area at any point in time from January 26, 2015, to the present (the "Class Period"). If the Court approves the settlement, the Class Period will continue until the date the Court's approval of the proposed settlement becomes final and non-appealable. The Class Area extends in an approximate 2.5 mile radius from the center of the High Acres Landfill, located at 425 Perinton Parkway, Fairport, New York 14450, and is illustrated in detail in Exhibit A to the Settlement Agreement.

5. **SUMMARY OF THE PROPOSED SETTLEMENT:** If the Settlement Agreement is approved by the Court, the Defendant will pay the total amount of $1,300,000 into the Settlement Fund for the benefit and advantage of all Settlement Class Members, each of whom will release his or her claims as set forth in Paragraph 8 below. After the deduction of any court-approved payments (a) to Class Counsel for attorneys' fees and the costs and expenses incurred in the case (which will not exceed $600,000) and (b) to the Named Plaintiff for bringing the lawsuit on behalf of the Settlement Class (which is expected to be no more than $5,000), the Settlement Fund will be evenly distributed to the households of all Settlement Class Members who submit

a Claim Form approved by Class Counsel. The Defendant also will spend at least $1,000,000 on improvement measures within 30 months to address the landfill emissions and reduce the potential for odor.

6.  **WHO ARE THE LAWYERS FOR THE SETTLEMENT CLASS AND HOW WILL THEY BE PAID?** The Court has appointed the following attorneys to represent you and the other Settlement Class Members: Steven D. Liddle and Nicholas A. Coulson of Liddle & Dubin, P.C., 975 E. Jefferson Ave., Detroit, MI 48207 and Jan Smolak, Michaels & Smolak, P.C. 17 E Genesee St #401, Auburn, NY 13021 ("Class Counsel").  You may contact Class Counsel at (800) 536-0045 or info@ldclassaction.com. You do not need to hire your own lawyer because Class Counsel is working on your behalf. But, if you want your own lawyer, you may hire one at your own expense. Class Counsel has prosecuted this case on a contingency basis. At the Settlement Fairness Hearing, Class Counsel will be seeking the approval of the Settlement Agreement and requesting the Court for an award of attorneys' fees, costs and expenses up to, but not to exceed $600,000 from the Settlement Fund. Class Counsel and Named Plaintiff also will seek approval of a $5,000 payment from the Settlement Fund for his efforts in representing the Settlement Class.

7.  **CAN I GET PAID AND, IF SO, HOW MUCH?** Each Settlement Class Member who participates in the settlement may submit an attached Claim Form which, if approved by Class Counsel, will permit the Class Member's household to share, pro rata, in the Settlement Fund.   The actual amount of each payment to each household will be the amount of the Settlement Fund remaining after the court-approved payments to Class Counsel and Named Plaintiffs divided by the number of households of the Settlement Class that submit Claim Forms approved by Class Counsel.

8.  **WHAT AM I GIVING UP TO STAY IN THE CLASS?** If the proposed settlement is ultimately approved by the Court, in exchange for everything Defendants are doing, each Settlement Class Member will release certain claims he or she may have against each Defendant and all related people and entities, as set forth more fully in the Settlement Agreement. This means that you will no longer be able to sue Defendants or any related people or entities regarding any claims described in the Settlement Agreement. It also means that all of the Court's orders will apply to you and legally bind you. In addition, you and the other Settlement Class Members will be prohibited from bringing any such claims that arise after the date the Court ultimately approves the Settlement Agreement until thirty months after the Effective Date of the Settlement. Any such claims arising during that timeframe are not released; rather, they can still be asserted by you, but only after Defendant has had the opportunity to complete the improvement measures they have agreed to implement.

9.  **HOW DO I REQUEST TO BE EXCLUDED FROM THIS PROPOSED SETTLEMENT?** If you are a Settlement Class Member and if the Settlement Agreement is approved by the Court, then you will be bound by the terms of the Settlement Agreement unless you submit a request to be excluded. **To exclude yourself from the proposed settlement, you must mail a written request for exclusion to Class Counsel  at the following address: Attn: High Acres Objections, Liddle & Dubin, P.C., 975 E. Jefferson Ave. Detroit, MI 48207.**

    This request for exclusion must be postmarked no later than _____. The request for exclusion must be in writing and contain the following: (a) the caption or other identification of the lawsuit at the top of the first page with the phrase "Request for Exclusion" underneath it; (b) the potential Settlement Class Member's full name, street address, email address, and telephone number; (c) the following statement requesting exclusion:

    > "I do not want to be a member of the Settlement Class in the High Axres Landfill Lawsuit. I understand that I will not participate in or receive any monetary benefit of the proposed settlement. I also understand that, if I want to pursue any right or claim I may have, it will be my responsibility to do so at my own expense."

    and (d) be signed by the potential  Settlement Class Member seeking to be excluded from the proposed settlement. Any potential Settlement Class Member's request for exclusion that does not meet these requirements is deemed invalid and ineffective and the potential Settlement Class Member will be considered included as part of the Settlement Class for purposes of the proposed settlement.

10.  **HOW DO I TELL THE COURT THAT I LIKE OR DISLIKE THE PROPOSED SETTLEMENT?**  If you are a potential Settlement Class Member and you do not properly request to be excluded, you can tell the Court you like the proposed settlement and that it should be

Questions?  Call toll-free 1-800-536-0045; e-mail info@ldclassaction.com or visit www.ldclassaction.com/HighAcres

approved, or that you object to the proposed settlement or any particular part of it, including Class Counsel's requests for fees and expenses. **Class Members desiring to object must submit a written Notice of Objection to Class Counsel at the following address: Attn: High Acres Objections, Liddle & Dubin, P.C., 975 E. Jefferson Ave. Detroit, MI 48207.**

This objection must be postmarked no later than _____. You can submit this objection by yourself or, if you like, you can hire a lawyer to assist you. Objections must be in writing and contain the following: (a) the caption of the lawsuit at the top of the first page with the phrase "Notice of Objection" underneath it; (b) the Settlement Class Member's full name, address, and telephone number; (c) the name and address of each lawyer or other person assisting you in filing the objection, if any; (d) the reason, grounds, and basis for the objection, including any legal authority supporting the objection the Settlement Class Member would like the Court and other parties to consider; (e) the signature of the Settlement Class Member who is objecting; and (f) copies of all documents the Settlement Class Member intends to present to the Court in support of the  objection, if any. If an objection is submitted by someone purporting to represent a Settlement Class Member, in addition to the Settlement Class Member's signature the objection must attach sufficient documentation to support the person's legal authority to represent the Settlement Class Member.

Objections that do not meet the requirements set forth above will be deemed invalid and the Court will not consider them. Class Counsel and Defendant reserve the right to challenge the validity and grounds of any objection. If you do not submit a written objection to the proposed settlement or the application of Class Counsel for attorney fees and expenses in accordance with the deadline and procedure set forth above, you will waive your rights to be heard at the Settlement Fairness Hearing and to appeal from any order or judgment of the Court concerning the matter.

11. **WHEN AND WHERE WILL THE COURT DECIDE WHETHER TO APPROVE THE PROPOSED SETTLEMENT?** The Court will hold a Settlement Fairness Hearing on _____, at _____ a.m./p.m. at the Kenneth B. Keating Federal Building 100 State Street, Rochester, New York 14614. At this hearing the Court will consider whether the Settlement Agreement and proposed settlement is a fair, reasonable, and adequate resolution of the lawsuit. If there are timely and properly submitted objections, the Court will consider them and any response the Parties may have. The Court may listen to people who have asked to speak at the hearing. At or after the hearing, the Court will decide whether to approve the Settlement Agreement and proposed settlement. The Court also will decide how much to award Class Counsel and Named Plaintiffs.

You do not have to attend the Settlement Fairness Hearing. Class Counsel will answer questions the Court may have. But, you are welcome to attend at your own expense provided you have not excluded yourself from the proposed settlement. If you timely and properly send an objection, you may attend the Settlement Fairness Hearing and talk about your objection, or you may have your own lawyer do so.  However, you do not have to attend even if you send an objection. As long as you timely and properly sent your written objection, the Court will consider it even if you do not attend.

12. **WHAT HAPPENS IF I DO NOTHING AT ALL?** If you do nothing at all, and you are a Settlement Class Member, you will be bound by the proposed settlement if the Court approves it. You will release your claims and receive the benefit of the improvement measures Defendants will implement, but you will not receive any payment from the Settlement Fund.

13. **WHAT HAPPENS IF THE COURT DOES NOT APPROVE THE PROPOSED SETTLEMENT?** If the Court ultimately does not approve the Settlement Agreement and the proposed settlement, or if the Court's approval is reversed on appeal or the Settlement Agreement is terminated, then the settlement shall become null and void. If the settlement becomes null and void, the case will proceed as though the Settlement Agreement was never entered into.

14. **ARE MORE DETAILS ABOUT THE PROPOSED SETTLEMENT AND MY RIGHTS UNDER THE PROPOSED SETTLEMENT AVAILABLE?** This Class Notice is a summary and does not describe all details of the Settlement Agreement or the proposed settlement.  More details are in the Settlement Agreement. For a complete, definitive statement of the terms of the Proposed Settlement, refer to the Settlement Agreement at www.ldclassaction.com/HighAcres. You may also contact Class Counsel at (800) 536-0045 or info@ldclassaction.com for more details of the lawsuit.

**PLEASE DO NOT CONTACT THE COURT WITH QUESTIONS ABOUT THIS NOTICE.**

Page 4 of 4

Notice of Proposed Class Action Settlement for Publication

# Exhibit C

### <u>NOTICE OF PROPOSED CLASS ACTION SETTLEMENT</u>

*A court authorized this notice. This is not a solicitation from a lawyer.*

*D'Amico v. Waste Management of New York, LLC,* Case No: 6:18-cv-06080-EAW
In the United Stated District Court for the Western District of New York

**If you owned and occupied, or rented residential property located within approximately 2.5 miles of the High Acres Landfill at any time since January 26, 2015, you may be a Settlement Class Member.**

Please read this Notice carefully, as it affects your legal rights. If you have questions, you may call toll-free 1-800-536-0045; e-mail info@ldclassaction.com or visit www.ldclassaction.com/HighAcres

A proposed settlement has been reached with the owner and operator of the High Acres Landfill ("Defendant") to resolve claims brought by the Plaintiff on behalf of a proposed class relating to the alleged emission of pollutants, air contaminants, and noxious odors ("emissions") from the landfill. The proposed settlement has been memorialized in a written agreement between the parties (the "Settlement Agreement").

| **Your Legal Rights and Options in this Settlement** | | **Deadline** |
|---|---|---|
| **MAKE A CLAIM FOR PAYMENT** | **The only way to get a cash payment.** You must <u>timely</u> submit a valid Claim Form, attached to the Long Form Class Notice which can be accessed as described below. | Deadline to submit a Claim Form: on or before ____ |
| **EXCLUDE YOURSELF OR "OPT OUT"** | **Receive no payment. Get out of this lawsuit. Retain your right to sue the Defendant.** If you exclude yourself, you will **<u>no longer</u>** be a Class Member. This means that you will not be eligible for the benefits or relief in the settlement. It also means that Class Counsel will not be representing you and there are statutes of limitations that may bar your individual claims. | Deadline to Exclude yourself: on or before ____ |
| **OBJECT** | **Write to the Court about why you do not like the Settlement.** You must follow the procedures outlined in the Long Form Class Notice (for access, see below). You must remain a member of the lawsuit (you cannot ask to opt out or be excluded) in order to object to the settlement. You still must timely submit a valid Claim Form if you wish to receive a cash payment. | Deadline to Comment or Object: on or before ____ |
| **DO NOTHING** | **You receive no payment. Remain bound by settlement.** By doing nothing, you will not recover money from the class action settlement. You will also be bound by the class action settlement and give up your rights to sue Defendant separately about the same or similar legal claims in this lawsuit. Even if you do nothing, Defendant will still undertake certain Improvement Measures pursuant to the Settlement Agreement to mitigate the effect of any potential odors associated with the operation of the landfill. | |

This is only a PARTIAL summary of the proposed settlement. Before deciding what action you will take, if any, it is important that you immediately review the Long Form Class Notice on the internet at: www.ldclassaction.com/HighAcres The Settlement Agreement can be accessed at the same location.

The Long Form Class Notice more fully defines the Class Area, and explains the settlement and the deadlines and procedures for you to object to the settlement or exclude yourself from the settlement if you desire to do so. To have a

copy of the Long Form Class Notice mailed to you, you can call toll free 1-800-536-0045.

# Exhibit D

# HIGH ACRES LANDFILL LAWSUIT CLAIM FORM

## CLASS ACTION SETTLEMENT

**GENERAL INSTRUCTIONS**

1. **THIS CLAIM FORM MUST: (a) BE POSTMARKED BY _____ , (b) BE FULLY COMPLETED, (c) ATTACH ALL REQUIRED DOCUMENTATION, (d) BE SIGNED BY YOU, AND (e) MEET ALL REQUIREMENTS OF THE SETTLEMENT AGREEMENT.**

2. In order to claim compensation from the settlement and to receive a payment from the Settlement Fund, a Settlement Class Member such as yourself must complete and return this Claim Form along with the requested documentation to Class Counsel: Attn: High Acres Claims, Liddle & Dubin, P.C., 975 E. Jefferson Ave., Detroit, MI 48207. If you fail to properly complete and timely return this Claim Form, your claim may be rejected, and you may be precluded from receiving any payment from the Settlement Fund, but you will still be bound by the Settlement Agreement if the Court approves it.

3. This Claim Form is directed to all Settlement Class Members as defined in the attached Notice of Pendency of Class Action Settlement (the "Class Notice").

4. IF YOU ARE NOT A SETTLEMENT CLASS MEMBER OR IF YOU, OR SOMEONE ACTING ON YOUR BEHALF, FILED A REQUEST FOR EXCLUSION FROM THE SETTLEMENT CLASS, DO NOT SUBMIT A CLAIM FORM. YOU MAY NOT, DIRECTLY OR INDIRECTLY, PARTICIPATE IN THE SETTLEMENT IF YOU ARE NOT A SETTLEMENT CLASS MEMBER. THUS, IF YOU FILE A VALID REQUEST FOR EXCLUSION IN A TIMELY MANNER, ANY CLAIM FORM THAT YOU SUBMIT, OR THAT MAY BE SUBMITTED ON YOUR BEHALF, WILL NOT BE ACCEPTED.

5. It is important that you completely read the Class Notice that accompanies this Claim Form and the Settlement Agreement. The Class Notice and Settlement Agreement contain the definitions of many of the defined terms (which are indicated by initial capital letters) used in this Claim Form. By signing and submitting this Claim Form, you will be certifying that you have read the Class Notice and Settlement Agreement, including the terms of the releases made by you and the other Settlement Class Members. Your Claim Form may be rejected if you do not check the box that says you have read the Class Notice and Settlement Agreement.

6. Submission of this Claim Form does not guarantee that you will get a share of the Settlement Fund. If the Court does not approve the proposed settlement, there will be no Settlement Fund or distribution from it. If the Court does approve the settlement, the distribution of the Settlement Fund will be governed by the claim procedures set forth in the Settlement Agreement or such other plan of allocation as the Court may approve.

7. You are required to submit copies of genuine and sufficient documentation in response to the requests contained in this Claim Form.  IF SUCH DOCUMENTS ARE NOT IN YOUR POSSESSION, PLEASE OBTAIN COPIES OR EQUIVALENT DOCUMENTS TO RESPOND TO THESE REQUESTS. THE LACK OF DOCUMENTATION MAY RESULT IN REJECTION OF YOUR CLAIM. DO NOT SEND ORIGINAL DOCUMENTS. KEEP A COPY OF ALL DOCUMENTS THAT YOU SEND TO CLASS COUNSEL. Any documents you submit with your Claim Form will not be returned.

8. If you or anyone in your household timely and properly completes and submits this Claim Form and it is approved by Class Counsel, a check will be sent to your household for your payment from the Settlement Fund in approximately thirty (30) days after the Court's approval of the settlement becomes final. You will have one hundred and twenty (120) days from the date of the check to cash it.  Any uncashed

checks after 120 days will become null and void and you or any other Settlement Class Member who fails to timely cash such a check will forever forfeit any claim to receiving any payment from the Settlement Fund.

9. Type or print legibly in blue or black ink.

**Claimant's Identity**

| | |
|---|---|
| _____ | _____ |
| Your Full Name (please print) | Your Spouse's Full Name (please print) |
| _____ | _____ |
| Current Mailing Street Address | Email Address |
| _____ | (_____) _____ |
| City, State Zip | Daytime telephone number |

**Eligibility**

I (1) own(ed) and occupied or (2) rent(ed) a residential property within the Class Area at some point in time from January 26, 2015 to the present.  ☐ Yes    ☐ No

**Claimed Address**

1. Is your affected address the same as your current address, above?  ☐ Yes    ☐ No

2. If no, please provide your claimed address within the Class Area:

_____

Street Address

_____

City, State Zip

**Proof of Identification**

You must attach to your Claim Form a copy of a government-issued photo identification to establish your identity and current address.  Please mark the box that identifies the requested enclosed item:

☐ Driver's License

☐ State Identification Card

☐ Other government-issued photo identification sufficient to prove your identity

**(Complete Other Side of Form)**

Claimed Address Status

If you own(ed) or rent(ed) a residential property within the Class Area, mark the box that describes your interest in that property and attach the requested documents to your Claim Form.

□ Owner/occupant  -  If marked, you *must* attach a copy of the deed or other documentation of ownership. If your current address as reflected on the proof of identification you provided does not match this address, please attach a utility bill or other proof that you resided at the property within the Class Area.

□ Tenant  -  If marked, you *must* attach a copy of either a valid lease or rental agreement.

Date you first owned or rented the property at this address_____

Do you currently own or rent property at this address?  □ Yes □ No

If you answered no to the prior question, date you last owned or rented property at this address_____

---

**Claimant's Certification**

By submitting this Claim Form, I declare under penalty of perjury that all statements herein are true and all responses in this Claim Form are true and accurate to the best of my knowledge. Further, that I have read the Notice of Pendency of Class Action Settlement (the "Class Notice") accompanying this Claim Form and understand the referenced Settlement Agreement, which I have had the opportunity to review.

_____Date: _____
Your signature

_____Date: _____
Your Spouse's signature

---

Your fully completed Claim Form must be postmarked no later than
to Class Counsel at the following address:

**Liddle & Dubin, P.C.**
**Attn: High Acres Claims**
**975 E. Jefferson Ave.**
**Detroit MI 48207-3101**